J. M. CORRIGAN ET AL. v. THE STATE.

THOMAS B. DUNN ET AL. v. THE STATE.

Decided February 28, 1906.

**Mexican Grant—Treaty—Legislative Confirmation—Resurvey and Patent.**

A valid grant made to five leagues of land in the State of Tamaulipas by the Mexican Government and protected by the treaty ceding sovereignty to the United States, passed title to the grantees to the boundaries specified, though they included an excess; and legislative confirmation of the title by Act of February 10, 1852, which required the claimants to have the land surveyed, file the field notes in the General Land Office, and procure patent, followed by a resurvey and patent covering five leagues only, and subsequent claim of

the excluded excess, by the State, as public domain, did not restrict them to the limits so defined, in the absence of evidence that they procured the resurvey, accepted the patent, or acquiesced in the new adjustment of the boundaries, and where there was evidence of their continued claim to the limits of the original grant.

Appeal from the District Court of Travis County. Tried below before Hon. V. L. Brooks.

*Cochran & Penn,* for appellants.—The undisputed evidence showed a valid grant of five leagues of land, embracing the lands herein recovered, perfected December 15, 1835, from the State of Tamaulipas to Diego Ynojosa.

There was no evidence to support the finding of the court, to the effect that subsequent to the date of said grant to Diego Ynojosa and to the annexation of Texas by the United States, a dispute arose between the owners of said grant and the State concerning the validity of the grant and the location of its boundaries, and that this dispute culminated in the passage by the Legislature of the State of Texas, in the year 1852, of an act confirming the validity of said grant.

The evidence was insufficient to warrant the court in finding as a fact that the resurvey of said lands and the issuance of a patent thereon were done at the instance of the owners of said Diego Ynojosa grant, and that such patent was accepted by them.

The appellants having shown a valid grant, embracing the lands in controversy, to Diego Ynojosa from the State of Tamaulipas, the title to said grant could not be affected or impaired by the said act of February 10, 1852, or any act done thereunder, but the patent issued under the provisions of said act could only be regarded as documentary evidence of the prior title to the extent of the lands described in said patent and could not have the effect of destroying the title of Diego Ynojosa or those claiming under him to lands outside of the field notes given in such patent. Clark v. Hills, 67 Texas, 145, 147; Morrow v. Whitney, 95 U. S., 554; Langdeau v. Hanes, 21 Wallace, 529; West v. Cochran, 17 Howard, 403; Dikes v. Miller, 24 Texas, 423-425; Sideck v. Duran, 67 Texas, 261.

*R. V. Davidson,* Attorney-General, and *T. S. Reese,* assistant, for appellee.—It having been shown that the heirs of Diego Ynojosa initiated the proceedings to have the title confirmed by presenting their claim to the commissioners, appointed under the Act of 1850, and making proof thereof; that the Commissioners reported the claim to the Legislature for confirmation; that the grant was confirmed and surveyed and patent issued under the provisions of the Act of 1852, it will be presumed that the survey was made by the procurement and under the direction of the claimants of the grant, and that the patent was issued upon their application and by their request and was accepted by them. Their grantees should not be allowed, after fifty years' silence, to repudiate the patent. Act of February 8, 1850, authorizing the appointment of the Commissioners (3 Gammel's Laws, bottom p. 582); Act of February 10, 1852, sec. 2 Id. bottom p. 949; Arts. 4175, 4176, Rev. Stats. To authorize the issuance of the patent it was neces-

sary that the persons claiming the land should have had the same surveyed. Patent having issued it will be presumed that all facts necessary existed to authorize its issuance. Sheppard v. Avery, 34 S. W. Rep., 440. Recording the patent was constructive delivery to the grantee therein. Newton v. Emerson, 66 Texas, 146, 147. Delivery and acceptance may be shown by circumstances. Hubbard v. Cox, 76 Texas, 242. Acceptance by grantee of deed for his benefit will be presumed. Note to Brown v. Westerfield, 53 Am. St. Rep., 545, 546; Stone v. King, 84 Am. Dec., 557; McCartney v. McCartney, 53 S. W. Rep., 390; Dikes v. Miller, 24 Texas, 423.

Having asked that the title be confirmed under the Act of 1852, had the survey made and accepted the patent, the grantee in the patent and those claiming under them can not now claim that the original grant contained land not embraced in such survey and patent. As the State is estopped to deny that the patent conveyed good title to all the land embraced therein, whether in fact embraced in the original and confirmed grant or not, so the grantees in the patent and those claiming under them are estopped to claim that the grant embraced land not included in the survey and patent. Nevell v. Terrell, 14 Texas Ct. Rep., 100; Forbes v. Withers, 71 Texas, 302; United States v. Roselius, 15 Howard, 31; Arguello v. United States, 18 Howard, 546; Doty v. Barnard, 92 Texas, 107.

FISHER, CHIEF JUSTICE.—In the two above styled cases the State, as plaintiff filed suits against the defendants in the District Court of Travis County in trespass to try title, to recover certain lands described in plaintiff's petitions, and for damages.

The defendants answered by general denial and pleas of not guilty. The trial was before the court without a jury and judgment rendered in favor of the State in the Corrigan case for the land sued for, and in favor of the State in the Dunn case for all the land sued for except about 200 acres.

The trial court filed its conclusions of fact and law, and the appellants in each case filed exceptions thereto, but no exceptions were made to the findings of fact by appellee. By agreement these cases were tried together, and it was agreed that on the appeal the cases should stand as one case, and that the judgment that might be rendered in the Corrigan case should be rendered in the Dunn case.

The findings of the trial court are as follows:

"1. The land, title to which is in controversy in this cause, was originally embraced in a grant of land expressed to be for five leagues made by the Mexican government to Diego Ynojosa. The validity of said original grant to Diego Ynojosa is not controverted in this suit, and for the purposes of this case, I find that same was a valid grant.

"2. Subsequent to the date of said grant, and to the annexation of Texas by the United States, a dispute arose between the owners of the grant and the State, concerning the validity of the grant and the location of its boundaries. This dispute culminated in the passage by the Legislature of the State of Texas, in the year 1852, of an act confirming the validity of the grant. Under the provisions of law existing at the date when said act of confirmation became effective, it was the

duty of the owners of said grant if they wished to avail themselves of said Act of confirmation and to procure a patent thereunder, to have the land embraced in the grant surveyed, and to file in the General Land Office of the State, within the time prescribed by law, the field notes of such survey, showing the boundaries of the grant. After said Act of confirmation, and within due time, the owners of said Diego Ynojosa grant did procure to be made the survey contemplated by law, and did file in the Land Office the field notes of same, and did on August 25, 1856, procure from the State a patent to the land embraced in said grant as so resurveyed. Said grant as so resurveyed, said field notes as filed in the Land Office, and said patent as issued thereon, show the land here in controversy to be no part of said Diego Ynojosa grant; and that the grant as resurveyed and patented contains five leagues of land. The State of Texas has continuously claimed the land in controversy since the enactment of said Act of confirmation and the acceptance of the terms of same by the owners of said grant, as evidenced by said survey, the filing of said field notes in the General Land Office by them, and issuance of said patent, and the land has been surveyed and appropriated by the State to the common free school fund. There is also evidence in the record which it is claimed shows that owners of the Diego Ynojosa grant have claimed the land in controversy by virtue of their ownership of said grant, since said Act of confirmation, survey thereunder, and the issuance of said patent, but such evidence is equivocal in character, and does not to my mind establish anything more than that said owners, since said date, have claimed that their grant originally included the land in controversy.

"3. It is agreed in open court that if plaintiff is entitled to recover judgment for the land as I have decided in this case, it is also entitled to recover the rents awarded in said judgment.

"4. The original owners of the Diego Ynojosa grant, under whom defendant claims owned same at and prior to the date when the treaty of Guadalupe Hidalgo became effective, and were at and prior to said date Mexican citizens.

"5. Defendant claims the land in suit solely under the Diego Ynojosa grant.

"*Conclusions of Law.*—Defendant's predecessors in title accepted the settlement made between themselves and the State concerning the boundaries of the Diego Ynojosa grant; and from the date of such acceptance became bound thereby; and could not now be permitted in such a suit as this to prove that the grant originally embraced the land here in controversy. The status of the land, title to which is in controversy in this suit, was fixed and determined by the terms of said settlement to be no part of said grant. Therefore, the owners of the grant, by virtue of such ownership, could not thereafter have conveyed to defendant any title to said land."

Whatever additional findings of fact or conclusions of this court that might relate thereto will be stated in the opinion in passing upon the several assignments of error.

Appellant's sixth assignment of error is to the effect that the court erred in finding as a fact that subsequent to the date of the Diego

Ynojosa grant and to the annexation of Texas by the United States, a dispute arose between the owners of the grant and the State concerning the validity of the grant and the location of its boundaries, and that this dispute culminated in the passage by the Legislature of the State of Texas, in the year 1852 of an Act confirming the validity of the grant. The court correctly found as to the validity of the Diego Ynojosa grant, and that it embraced all the lands in controversy.

It appears from the evidence that the grant in controversy is located in that portion of the State of Texas that was, prior to the Revolution, a part of the State of Tamaulipas, Mexico; and that in 1835, the grant, by proper steps previously taken, became perfect, and that the field notes of the surveyor Canales, which call for the surrounding grants, taken in connection with the evidence in the record, locate the lands in controversy as being embraced within the boundaries and limits of the original Diego Ynojosa grant. The documentary evidence accompanying the title show that at the proper time the proper steps were taken to establish the juridical possession; and there is nothing indicating, up to the time of the perfection of the grant, and during the period of time over which Mexico entertained jurisdiction of the territory where the land was situated, that she ever asserted any right or that the rights of the original grantee were ever questioned or disturbed. The land had been in possession of those claiming under the original grant for a number of years, and they were asserting a claim to the extent of the boundaries defined in the Canales survey. It is the excess of the five leagues called for in the grant upon which the locations have been made, the title to which is claimed by the State and which is in controversy here. Prior to 1850 or 1852, it does not appear from the evidence that the State was asserting any right to these lands. In fact, whatever assertion of right the State has made has been subsequent to the time that the patents were finally issued, based upon the legislative confirmation in 1852.

Now, with this preliminary statement, we will dispose of the sixth assignment of error. We have closely read the record, in order to ascertain if there is any fact upon which the finding of the court here complained of relating to this survey could be based. We do not find that there was any dispute between the claimants of this survey and the State of Texas as to the title to this land up to or prior to 1852, other than the mere historical fact that as to lands lying within that portion of Texas, formerly a part of the State of Tamaulipas, there had been a commission appointed to investigate title, and that as to the titles to much of the lands within this territory, there was a suspicion or doubt as to their validity. It does appear, however, that the claimants of this grant, or that some one pretending to represent the claimants of this grant, appeared before Bouland and Miller, the commission appointed under the Act of 1850, and introduced evidence that was satisfactory to the Commissioners, tending to establish the existence and the validity of the grant. A favorable report, based upon this evidence, was furnished by Bouland and Miller to the Legislature, which by the Act of February 10, 1852, in the following language, released to Diego Ynojosa the land in controversy: "That the State of Texas hereby relinquishes all her right and interest in the following

described lands to the original grantees thereof, their heirs and legal assigns, to wit: Jose Marcelo Ynojosa, 14 leagues; Santos Garcias, 5 leagues, and Diego Ynojosa 5 leagues. That it shall be the duty of those claiming any of the lands named in this Act to have the same surveyed by the district or county surveyor of the county in which the same may be situated, and upon the return of the field notes thereof to the General Land Office, the Commissioner is hereby authorized and required to have the same platted on the maps of his office, and issue patents to the same in accordance with the existing lines, and provided that no patent shall issue for a less amount than the original grant."

The seventh, eighth and thirteenth assignments of error complain of the findings of the trial court to the effect that the owners or claimants of the Diego Ynojosa grant accepted the benefits of the legislative confirmation, and had the lands surveyed and the field notes returned and filed in the Land Office and the patents issued. As stated, the evidence does show that the Legislature confirmed the Ynojosa grant for five leagues; a survey was made and the field notes returned to the Land Office and a patent was issued. The fifth finding of fact of the trial court is to the effect that defendant claimed the land in suit solely under the Ynojosa grant. We understand that to mean that the defendant, as a basis for title is only asserting the Diego Ynojosa grant, and that his right thus asserted is independent of any supposed right that he acquired by the subsequent patent and survey. The land described in the patent merely embraced five leagues. The original Ynojosa grant contains about 4,500 acres in excess of five leagues. In this connection the appellants complain of the legal conclusion of the trial court to the effect that the predecessors in title of appellants accepted the patents and the boundaries contained therein, and can not now assert a right to the limits and boundaries of the original grant.

This brings us to what we regard as the important question in the case. There is no evidence in the record that the survey subsequent to the legislative confirmation was caused to be made by those asserting the title in the Ynojosa grant, nor that the issuance of patents was procured by them. It is true, the field notes are on file in the Land Office, and the patent was undoubtedly issued; but there is no evidence, as before said, showing that these parties procured the surveyor to make a survey, nor is it shown that the patent was ever issued and delivered to them or to anyone representing them. If they were asserting a right under these documents, it could be assumed that they were connected with their issuance and execution, but the court finds in its fifth subdivision, that the defendants are solely claiming under the Diego Ynojosa grant. If it could be conceded that they did go before Miller and Bouland and make proof, and that the Legislature subsequently confirmed the grant, or released the right of the State to the same, it would not necessarily follow that they caused a survey to be made and accepted a patent predicated upon the confirmation for less land than they were thereby entitled to, and for less land than the Legislature intended they should receive.

Now the Act of 1852 that confirms the Ynojosa grant does not attempt to set out the boundaries, but merely releases the right of the State to five leagues; and is a direct confirmation of the Diego Ynojosa

grant; and the act providing for the survey in express terms states that no patent shall issue for a less amount than the original grant. These people, situated as Diego Ynojosa was, within the territory where the titles were directed to be investigated by the commission appointed, could with safety go before that body, relying upon the fact that if their grants were valid and legal, that they would receive the recognition and respect due them under the laws of the former government, which were guaranteed by the treaty of Guadalupe Hidalgo; and that if thus recognized as being valid the recognition would extend to every acre of land included within the original boundaries. The Legislature in the Act of 1852 was actuated by this spirit, for they expressly stated that the patent should not issue for a less amount than the original grant. That was a part of the scheme of confirmation, and they never expected and it was never intended to confer upon a surveyor, who should exercise his functions under that Act, power to locate the land just as he saw fit or desired to do, and thereby reduce the quantity to less than what could be lawfully ascertained to be within the limits of the original grant. The law was an express limitation upon the power of the Commissioner of the Land Office to issue a patent for a less amount than the original grant. It was nothing unusual in that time and day when the Ynojosa was originally granted, that the Surveyor General of the State of Tamaulipas, or of other States of Mexico bordering on the frontier, should so survey these original grants as to contain a large excess of land. The lands were regarded of little worth, and their principal value was for pasturage purposes. It is a fact familiar to all who have had occasion to investigate original grants lying within that territory, that they generally contained a large excess. And we have found nothing in the law of Tamaulipas, or of the Republic of Mexico that is applicable to the title in question, that would denounce or declare illegal a title or grant issued on the ground that it contained an excess equal to the number of acres shown in the Ynojosa.

This being true, the Legislature, when they released the right of the State, released it to the boundaries of the original grant; and the surveyor appointed under that law had no authority to disregard this legislative purpose and intent, and to make a survey that would materially cut down and reduce the quantity of land contained in the original grant. But, however, having done so, the claimants or those asserting the right and title to the original grant, evidently it could be assumed, declined to accept and be bound by the work of that surveyor, or to receive and accept a patent based thereon and subsequently issued. But doubtless preferred to stand upon the right and title conferred by the original grant. After the field notes were returned to the Land Office and there filed by the official surveyor who was charged with the duty of making the survey under the Act of February 10, 1852, the Commissioner of the Land Office doubtless regarded it as his duty to issue a patent, probably not having any knowledge of the fact that the original grant had been materially reduced in quantity by the new survey. The findings of the court in these particulars complained of are, in our opinion, opposed to the evidence, or the reasonable de-

ductions to be drawn from it. The facts more nearly justify the fifth finding of the trial court.

The court in the case of Hanrick v. Dodd, 62 Texas, 89, uses an expression which was applied to a different state of facts, but which is not inapplicable here: "Under the Mexican law, as under the common law, an estate granted by the government can not be divested upon mere surmise or suggestion; a formal conveyance or regular proceeding is necessary." And the court further says, in speaking of the correspondence between Borden, the Commissioner of Land Office, and James Howlett, a surveyor: "It was offered as tending to show that the 11 league grant on the Brazos River, the first one extended to Rafael de Aguirre, had been abandoned. We think the evidence was properly excluded. It was hearsay. If it had not been, a title which had vested could not be divested by a mere declaration of abandonment." We don't deny a proper application of the doctrine of merger which would not apply in this case. Nor will it be denied that rights may be abandoned by accepting others in lieu of them, nor are we required to hold to what extent the doctrine of abandonment would have applied, if the title to the Ynojosa had been merely equitable or imperfect at the time the territory in which it is situated ceased to be a part of Mexico, but when that event happened, the title in question was a perfect grant. The Mexican government had parted with all that it could convey, and every step had been taken that was then required by law, and it is hardly to be supposed that the grant being of this nature, which needed no confirmation in order to give it validity, that it was ever the intention and purpose of the Legislature by the act of relinquishment, to undertake to disturb the original title to any extent, or the lands embraced within the boundaries of the grant. It was not the subsequent patent that conferred the title. It existed by virtue of the original grant, which was recognized by the legislative confirmation to its full extent. The mere ministerial act of issuing the patent would not affect the legal title already in existence. (Clark v. Hills, 67 Texas, 145; Langdeau v. Hanes, 21 Wall., 529.

Judge Field, when of the Supreme Court of California, in passing upon Sutter's title (10 Cal., 619) in discussing questions similar to those we are now considering, said:

"Under Mexico it might have been submitted to the Territorial Assembly, reported against, forwarded to the Supreme Government, and been there rejected; or, in case the conditions of the regulations, as to cultivation or occupation of the land, had not been complied with, it might have been denounced, and upon proper investigation, the estate declared forfeited. But, until one or the other of these proceedings had taken place, the title continued in Sutter unimpaired. Neither of these proceedings were had under the Mexican government, and, therefore, at the date of the cession of California to the United States, his title remained in full force. And that title was in no respect impaired by the treaty of cession. By the law of nations, independent of treaty stipulations, the inhabitants of a ceded territory retain all rights of property. 'Had Florida changed its sovereign,' says Mr. Chief Justice Marshall, in United States v. Percheman (7 Peters, 86), 'by an Act containing no stipulation respecting the property of individuals, the

right of property in all those who became subjects or citizens of the new government would have been unaffected by the change. It would have remained the same as under the ancient sovereign. . . . A cession of territory is never understood to be a cession of the property belonging to its inhabitants. The king cedes only that which belonged to him. Lands he had granted were not his to cede. Neither party could so understand the cession; neither party could consider itself as attempting a wrong to individuals, condemned by the practice of the whole civilized world. The cession of a territory by its name, from one sovereign to another, conveying the compound idea of surrendering, at the same time, the lands and the people who inhabit them, would be necessarily understood *to pass the sovereignty only, and not to interfere with private property.'*

"Independent of the protection afforded by the law of nations to the property of the inhabitants of a ceded territory, the government of the United States, by the treaty of Guadalupe Hidalgo expressly stipulated that those citizens of the Mexican Republic, in the territories ceded, who might elect to become citizens of the United States, should be incorporated into the Union, and be admitted at the proper time to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution, and in the meantime be maintained and protected in the free enjoyment of their liberty and property (article 9), and all those citizens of the territories are considered to have thus elected, who, within one year after the exchange of ratifications of the treaty, did not declare their intention to retain the character of Mexicans (article 8). The stipulation for maintenance and protection, even if such maintenance and protection were not obligatory, independent of the treaty, operated until the admission of California as a State into the Federal Union; and, as a matter of course, since such admission, those citizens are entitled to the same protection in their property which is afforded to other citizens of the United States. It is true that the United States, in their political capacity, have succeeded to all the rights of Mexico, in respect to the grant to Sutter, so far as the constitution and laws of their government allow the exercise of such rights, but it is equally true that rights and powers inconsistent with the principles of their constitution and government, can neither be taken nor exercised. 'It can not be admitted,' says the Supreme Court, in Pollard's Lessee v. Hagan, 'that the king of Spain could, by treaty or otherwise, impart to the United States any of his royal prerogatives; and much less can it be admitted that they have the capacity to receive or power to exercise them. Every nation acquiring territory by treaty or otherwise, must hold it subject to the constitution and laws of its government, and not according to those of the government ceding it.' (3 How., 225.)

"The supreme government of Mexico possessed the power to reject upon its own mere volition, an empressario grant to one of its citizens, made by the Governors of its departments, under the colonization laws, but it may be questioned whether this power, which the government exercised to control the action of its subordinate officers, passed to the government of the United States.

"The only mode of avoiding an estate under the Mexican authorities,

other than by the direct rejection of the supreme government, was, as we have already observed, by proceedings having their origin in what is termed a denouncement, which is entirely unknown to our laws. It may, therefore, be a question whether any right of defeasance or forfeiture, which may have existed in the Mexican government, in respect to the grant to Sutter, ever passed to the United States, and whether the grant did not, by operation of the treaty of cession, become discharged of all conditions. It is not necessary, however, to pass upon this question; it is sufficient for the disposition of the present case that the title of Sutter under his grant was in no respect impaired by the treaty. Under the former government, Sutter was entitled to the possession of the land under his grant; indeed, the conditions of cultivation or occupancy attached to it by the regulations of November, 1828. To avoid a denouncement, and a possible forfeiture of his estate, he was required to cultivate or occupy the land, and its possession was his right, which could have been enforced under the Mexican government. It was a right to the use and enjoyment of property, and as such, was guaranteed by the stipulations of the treaty. It accompanied his grant, and like any other right of property, may be enforced in our courts. The grant conveying, as we have seen, the title, carries with it the right to the possession, use and enjoyment of the land, until by the appropriate action of the general government, the estate of the grantee is defeated—admitting that it is competent for the government to provide for defeating it. It follows that the action of ejectment will lie directly upon the grant to recover the land, or any portion thereof, embraced within its boundaries."

This court in the cases of the State v. Russell, 85 S. W. Rep., 288, and Haynes v. the State, 85 S. W. Rep., 1030, on occasions where we were required to pass upon the validity of titles within the former limits of the State of Tamaulipas, substantially said that titles that had become final and legal prior to the Revolution, needed no protection at the time of change of government from the treaty, citing Fremont's case, 17 How., 542; Dent v. Emmeger, 14 Wall., 308, and Ainsa v. New Mexico & A. Ry. Co., 175 U. S., 76.

The question is fully discussed in the two cases cited in the 85 S. W. Rep. In the Russell case the attack was made by the State on the ground that the Russell title was imperfect; and the State also sued to recover for the excess of land embraced in the grant involved in that case. We held in that case that the El Perdito, the grant in controversy, was a perfect grant before Tamaulipas ceased to be a part of Mexico, and that the calls for the surrounding surveys (the course adopted, to some extent, in those days in identifying grants) should be regarded and given effect in ascertaining the extent of the land embraced in the grant. And we further held that a mere excess, which was a considerable number of acres, would not invalidate the grant or make it subject to the claim of the State. In that case we also laid stress upon the fact that if there was any uncertainty or doubt in the calls, or as to which class of calls should prevail, effect should be given to the extent of the juridical possession, in order to ascertain and determine what land was embraced in the original grant, citing the case of United States v. Pico, 72 U. S., 540.

In construing Spanish or Mexican grants, and in determining the extent of the boundaries, the Supreme Court of the United States in United States v. Sutherland, 19 How., 364, says:

"In construing grants of land in California, made under the Spanish or Mexican authorities, we must take into view the state of the country, and the policy of the government. The population of California before its transfer to the United States, was very sparse, consisting chiefly of a few military posts and some inconsiderable villages. The millions of acres of land around them, with the exception of a mission or a rancho on some favored spot, were uninhabited and uncultivated. It was the interest and the policy of the king of Spain, and afterwards of the Mexican government to make liberal grants of these lands to those who would engage to colonize or settle upon them. Where land is plenty and labor scarce, pasturage and raising of cattle promised the greatest reward with the least labor. Hence persons who established ranchos required, and readily received, grants of large tracts of country as a range for pasturage for their numerous herds. Under such circumstances, land was not estimated by acres or arpens. A square league, or 'sitio de ganado mayor,' appears to have been the only unit in estimating the superficies of land. Eleven of these leagues was the usual extent for a rancho grant. If more or less was intended in the grant, it was carefully stated. Surveying instruments or surveyors were seldom to be obtained in distant locations. The applicant for land usually accompanied his petition with a *deseno,* or map, showing the natural boundaries or monuments of the tract desired. These were usually rivers, creeks, rivulets, hills and mountain ranges. The distances between these monuments were often estimated at about so many leagues, and fractions of this unit but little regarded. To those who deal out land by the acre, such monuments as mountains, hills, etc., though fixed, would appear rather as vague and uncertain boundary lines. But where land had no value and the unit of measurement was a league, such monuments were considered to be sufficiently certain. Since this country has become a part of the United States, these extensive rancho grants which then had little value, have now become very large and very valuable estates. They have been denounced as enormous monopolies, princedoms, etc.; and this court has been urged to deny to the grantees what, it is assumed, the former governments have too liberally and lavishly granted. This rhetoric might have a just influence, when urged to those who have a right to give or refuse. But the United States have bound themselves by a treaty to acknowledge and protect all bona fide titles granted by the previous government; and this court have no discretion to enlarge or curtail such grants, to suit our own sense of propriety; or defeat just claims, however extensive, by stringent technical rules of construction, to which they were not originally subjected."

When we apply these views to the facts of this case it affords protection to the original grant and it is clear that the land sued for by the State is contained within the calls of the original grant. The grant called for surrounding surveys, the locality of one of which is admitted by the State, and as to the others, there is not much uncertainty in the evidence, if any. The court finds, practically, that the

land in controversy is within the limits of the original grant; and the testimony upon this question clearly confirms us in this view of the trial court. In fact, as we construe the evidence in the record concerning the calls, and the evidence of the location of the surrounding surveys, in connection with the juridical possession, there can be no controversy, in our opinion, as to the fact that the original Diego Ynojosa includes all of the land sued for.

Having these conclusions, one result must follow—that is, that the judgment must be reversed and here rendered in favor of the appellants in both of the cases.

*Reversed and rendered.*

### OPINION ON REHEARING.

A further examination of this record leads to the conclusion that the appellants' contention, as urged in their ninth, tenth and sixteenth assignments of error is substantially correct. There is practically no dispute as to the facts with reference to the question of boundary, which subject with reference to the burden of proof, is fully and fairly treated by appellants in their briefs from pages 13 to 23; and, without discussing the question, we approve substantially what is there said.

The seventh objection of the State in its motion for rehearing is as follows: "Because the court erred in finding that the act of confirmation of February 10, 1852, provided for the issuance of patents to the lands mentioned in the act of confirmation in accordance with existing lines; and thereupon rendering judgment reversing the decision of the lower court and rendering judgment in favor of appellant; the above quoted language being a misquotation from said act, which reads: 'in accordance with existing laws.' "

If there has been any serious error committed, it consists in the statement that the court found that the act required patents to be issued in accordance with existing lines. No such finding was made. We stated in the opinion that the law provided that no patent should issue for a less amount than the original grant. In copying the law in the opinion there was a mistake made in the use of the word "lines" instead of the word "laws." And it becomes apparent when the opinion is read that no stress was laid upon that word; and it is equally apparent that placing the word in the opinion was a mere error in copying. Motion for rehearing is overruled.

Writ of error refused.