**STATE v. INDIO CATTLE CO. et al.**

**No. 11009.**

Court of Civil Appeals of Texas.
San Antonio.

July 16, 1941.

Rehearing Denied Oct. 1, 1941.

Gerald C. Mann, Robert E. Kepke, Ocie Speer, and D. D. Mahon, all of Austin, for appellant.

Terrell, Davis, Hall & Clemens, Trueheart, McMillan & Russell, and George Luhn, all of San Antonio, and Felix Raymer, of Houston, for appellees.

MURRAY, Justice.

This suit was instituted by the State of Texas, acting by and through its Attorney General, Hon. Gerald C. Mann, for and on behalf of the Public Free School Fund, against Indio Cattle Company, a corporation, J. D. Cage, Richard G. Cage, Robert C. Cage, J. M. West, J. Marion West, B. G. Barnes, Mrs. Ermin F. Barnes, Gus H.

Krausse and a number of other defendants, seeking in a trespass to try title suit a recovery of 165,762 acres of land situated in Maverick, Webb and Dimmit Counties, Texas, and generally referred to as the Antonio Rivas Grant.

In a second count the State sought the recovery of 61,192 acres, out of the 165,762 acres above mentioned, being the alleged excess over and above the twenty-five leagues of land granted by the Government of Spain to Antonio de Rivas on February 17, 1765. In a third count the State sought a recovery of 46,062 acres of land out of the 165,762 acres first mentioned being the alleged excess above twenty-eight leagues and ten labors contained in the Antonio Rivas grant, according to a survey made by J. Varian Smith in 1853.

The above named defendants, as well as other defendants, answered by a plea of not guilty and also filed a cross-action seeking a recovery of the entire 165,762 acres.

The trial was to a jury, to whom only two issues were submitted. The first issue was answered favorably to the defendants and the second issue was answered favorably to the State. The trial court granted a motion of defendants and entered judgment non obstante veredicto, from which judgment the State has prosecuted this appeal.

Appellant's first seven propositions present the contention that the trial court erred in rendering judgment non obstante veredicto.

The entire difficulty in this case is the location of the corner called Rositas de San Juan. This corner is called for both in the grant from the Government of Spain to Antonio Rivas and in the patent issued by the State of Texas to the heirs of Antonio Rivas in 1872, based upon the survey made by J. Varian Smith in 1853.

The original Rivas Grant from the Government of Spain began at a point on the Texas side of the Rio Grande River, at a point opposite the mouth of a stream on the Mexican side called Penitas de Abajo (lower Penitas), and running thence to a ford called the Arroya de San Ambrocia (San Ambrosia Pass) and along the high hills of said arroya in a northerly direction to the Rositas de San Juan, thence to the head (Nacimiento) of Cuevas Creek, thence to the mouth of Cuevas Creek, and thence down the Rio Grande River, with its meanderings, to the place of beginning. The patent issued by the State of Texas was based upon the survey of J. Varian Smith. He began his survey at the lower Penitas and ran thence to the San Ambrosia Pass, thence to Rositas de San Juan, thence to the head of Cuevas Creek, thence to the mouth of Cuevas Creek, and thence down the Rio Grande to the place of beginning. As we view the case all of these corners can be definitely located without a great deal of difficulty, except the corner known as Rositas de San Juan. The entire suit hinges upon the location of the so-called Rositas corner.

There is a preliminary question which should be disposed of before discussing the location of the Rositas corner. This question is the validity of the J. Varian Smith survey and the patent issued by the State of Texas based upon this survey. The State contends that both the survey and patent are void, because Smith received a portion of the land for his services in making the survey while he was a deputy surveyor for the Bexar District, and that a fraud was perpetrated upon the State in that there was gross misrepresentation as to distances between certain points.

It would be well to here state the facts leading up to the Smith survey in 1853 and the issuance of the patent by the State in 1872. The land here involved was originally granted by the Government of Spain to Don Antonio de Rivas in 1765, before there was either a State or a Republic of Texas. This land was located between the Nueces and Rio Grande Rivers and under the Treaty of Guadalupe-Hidalgo, entered into on February 2, 1848, between the United States of America and the United States of Mexico, the validity of this Spanish grant was recognized.

On February 8, 1850, Acts 1849–50, c. 122, the legislature of Texas created a Land Commission to investigate land titles in certain counties, and this Land Commission made a report, duly filed, finding that the grant from the Government of Spain to Antonio de Rivas was a valid grant. The original Rivas Grant was for twenty-five leagues of land, together with excesses and surpluses. It did not purport to be a survey, but was described by certain natural objects, such as the mouth of creeks, passages of creeks, high hills and the head of creeks. It became desirable to survey this grant and secure a patent from the State. J. Varian Smith was employed to make this survey

in 1852, and made such survey in 1853. Upon this survey the State issued a patent in 1872, to the heirs of Antonio Rivas, and the State is bound by this survey by Smith, unless it be rendered void for the reasons urged by the State.

■■ The record shows that J. S. McDonald, District Surveyor of Bexar District, and J. Varian Smith, Deputy District Surveyor of this district, received a deed to three leagues of land out of the Antonio Rivas Grant for their services in making and filing field notes and plat of the Antonio Rivas Grant. This conveyance was made shortly before the field notes and plat were finally approved and filed in the General Land Office. Appellant contends that these surveyors were officers of the State and had an interest in the land adverse to the State at the time the survey was being made and therefore such survey is void. We overrule this contention. The fact that the surveyors were ultimately paid in land does not establish the fact that they had such interest at the time the survey was being made. The original contract may have been to pay them cash and the agreement to take land in place of cash may have been reached after the survey was made. Furthermore, the survey was not of public land, but of a grant made by the Spanish Government some eighty (80) years prior thereto. It was a survey of land that never belonged to the State of Texas under the treaty of Guadalupe-Hidalgo. Furthermore, the State accepted the survey and plat and issued a patent thereon more than seventy (70) years before any such contention was raised. It is now too late to raise such a question. The fact that some of the distances were in error by more than 4,000 varas does not conclusively establish that the survey was fraudulently made, when it is taken into consideration that in 1852 surveying instruments were scarce in that part of Texas, and land and wild Indians were plentiful.

■ Appellant did not request that any issues regarding such matters be submitted to the jury, and thereby waived such matters or at least left them to be decided by the trial judge, which he has impliedly decided against the contention of appellant.

Appellant cites several cases in support of its contention, but all of these cases are easily distinguishable from the case at bar.

Wills v. Abbey, 27 Tex. 202, 203, was a suit in which the administrator of one Mitchell, a surveyor, was attempting to recover one-third of a league and labor of land under a contract where a district surveyor was to locate a certificate, secure a patent and pay all expenses for a consideration of one-third of the land thus located. The court properly held the suit was based upon an illegal contract.

In Cotulla v. Laxson, 60 Tex. 443, a county surveyor made application to himself to purchase land found by the court to be public lands. The court properly held such application to be void.

In State v. Thompson, 64 Tex. 690, 694, the court simply reiterates what was said in Cotulla v. Laxson, supra.

It seems to us that the case of DeShazo v. Eubank, Tex.Com.App., 222 S.W. 976, 977, is against appellant rather than favorable to it. DeShazo filed on certain school land in El Paso County, but before making proof of occupancy executed a quitclaim deed to one Eubank, County Surveyor. The Commission of Appeals held that this conveyance by DeShazo to Eubank was void, because Eubank, as County Surveyor, was prohibited by law from speculating in public land, but held in effect this transaction would not affect the sale by the State to DeShazo, we quote:

"That court [Court of Civil Appeals, 191 S.W. 369] held, in effect, that the commissioner, being vested with the power to make a sale and award of the land to a qualified purchaser, having determined that DeShazo was such a purchaser, as the owner of and settler upon the Grandview lots, and having actually made the sale and award, and DeShazo having complied with all the terms and conditions of his purchase, and the certificate of occupancy having issued, the sale and award cannot be regarded as a nullity and subject to collateral attack. In this conclusion we concur. * * *

"It is to the interest of the state, as well as of the purchasers of the school land, that the titles of such purchasers be established, at least to the extent of being invulnerable to collateral attack, at some time prior to the issuance of the patent. To permit such attacks through all the years, where the purchaser exercises his option of payment of the purchase money in annual installments, would be promotive of continuous litigation and strife.

The evident intention of the Legislature in requiring proof of occupancy and the issuance of the certificate was, in the language of the court in Logan v. Curry, supra [95 Tex. 664, 69 S.W. 129]:

" 'To set at rest the question of actual settlement, and to establish the purchaser's right to the land, subject only to the condition that he pay the unpaid installments of purchase money and interest thereon, as required by the statute.' "

The treaty of Guadalupe-Hidalgo recognized the validity of all Spanish grants lying between the Nueces and Rio Grande Rivers. The Legislature of the State of Texas having, in 1850, appointed a Land Commission to investigate these Spanish Grants, and Rivas Grant having been surveyed by J. Varian Smith in 1853, the State having relinquished all claims to the Rivas Grant, by its acts of 1852, and having issued a patent to the heirs of Antonio Rivas in 1872, based on the Smith survey, such patent cannot now be regarded as a nullity and subject to collateral attack. If the State desired to set the patent of 1872 aside, the burden was upon it to solicit findings from the jury which would justify a setting aside of this patent. Appellant did not request that any such issues be submitted, nor did it except to the failure of the court to submit such issues. By such failure it waived its right to ask that the patent of 1872 be set aside. It might be further stated that had such issues been submitted the evidence would have been insufficient to have supported findings favorable to appellant.

The last case cited by appellant on this point is Stanolind Oil & Gas Co. v. State, Tex.Sup., 133 S.W.2d 767, 777. The holding in that case is to the effect that an application to lease vacant land made by a State land-surveyor, as agent for an oil company, is void because what a surveyor could not do for himself he could not do as agent for another. It is true that the court says, "all of the acts of such surveyors are held to be void where they have any interest in the subject matter involved," but this language must be construed in connection with the facts of the case in which it was used. It could not be construed as meaning that a patent issued in 1872 by the State could be collaterally attacked because after the survey of a Spanish grant was made by Smith he was deeded a part of the land.

The only question remaining is: Where did Smith locate the corner called Rositas de San Juan? If this corner can be conclusively located from the evidence, then the trial court properly rendered judgment non obstante veredicto.

There can be no doubt about the corner or point known as the San Ambrosia Pass. It is located at a point where the Old Royal Road crossed the San Ambrosia Creek. It was just south of the confluence of two branches of the San Ambrosia Creek. One bearing tree was found at this point and a place where the other bearing tree had been washed out. The State does not contend that this point is located anywhere else. Smith says that he went north 9½° east from the San Ambrosia Pass, a distance of 18,765 varas, to the place "known as the Rositas de San Juan," where he marked a six-inch mesquite as S. 75, W. 66 varas for a landmark. His map accompanying his field notes shows this point as located on San Ambrosia Creek (the right-hand branch above the confluence) at a place where an old road crossed the creek, being one of the places "well known by their respective names."

In 1879, Wyschetzski, Deputy Surveyor, attempted to locate the Rositas corner, but, as he started from a point some half mile or more below San Ambrosia Pass, at a new crossing on the creek, failed to find the Rositas corner and the bearing tree, and, instead, set up his own marker in the form of a stake, mound and ditch.

William Martin Locke, in 1884 and 1885, coursed from San Ambrosia Pass N. 9° 31' E. 19,492 varas up the north prong of the San Ambrosia, which he called Rositas de San Juan Creek, and found "a stake with a large mound of earth around it at the Rositas de San Juan, from which a mesquite now 15 in. in dia. brs. S. 75 W. 66 vs. (this tree is called 6 in. in dia. in the patent). The old marks on the tree are plainly visible." This corner was also identified by the two original chain carriers with J. Varian Smith. Locke's plat shows precisely where he found the actual patent corner and where Wyschetzski set up his own corner.

The Land Office map of 1849 shows the location of the Rositas de San Juan as being on San Ambrosia Creek, being *the right hand branch* of this creek above its confluence with other branches at San

Ambrosia Pass, and at a point where the Presidio to San Antonio Road crossed the creek.

The various General Land Office maps of Bexar District and Maverick County, of 1863, 1874, 1875, 1878 and 1892, all show this corner and the road crossing at that place.

O. H. Hector, in 1906, when surveying the grant, likewise placed this corner on the right-hand branch of San Ambrosia Creek at a point where an old road crossed the creek.

The State, on January 30, 1888, patented I. & G. N. Survey No. 20, Block 9, along the line of the Rivas Grant, calling for a bearing on the original E. Cor. of the Rivas Grant, from which a mesquite bore S. 75 W. 66 varas. This patent recognized the Rositas corner and called for the original bearing tree marked by Smith, being issued on the field notes of O. H. Hector.

C. R. Hedke, surveyor and engineer, testified that he ran the line from San Ambrosia Pass to the Rositas de San Juan corner, the distance found being 19,547 varas, this being 55 varas more than Locke's distance and 782 varas more than Smith's distance. He found a fence corner, an iron stake and a pile of rocks on the bank of the stream near the old road crossing—the road still existing—from which a mesquite, marked as described in the patent and by Locke, bore S. 75 W. 66 varas. The evidence shows that the marks on this tree are just as old as the marks on the bearing trees at the other corners of the Smith survey.

The State offered the testimony of the witnesses Tom Patterson, John Pace, Sebastian Perez, C. C. Taylor, Herman Leeman and an old negro, Doc Murray. All of these witnesses testified that at the present time the west prong of the San Ambrosia is known as the San Ambrosia above the confluence at the Pass, and that the north prong is known as Olmos Creek. Of course, none of these witnesses attempted to testify as to the names of these two prongs in 1765, when the Spanish Government granted this land to Antonio Rivas, or in 1852, when J. Varian Smith was making his survey. There is language in the Spanish Grant which would indicate that perhaps the grant should go up the west prong of the San Ambrosia, instead of the north prong, but inasmuch as the State patented this land in 1872, upon the field notes of J. Varian Smith, and inasmuch as Smith unquestionably went up the north prong and not the west prong, all of this testimony is unimportant.

The only one of these witnesses who attempted to state where the point, Rositas de San Juan, was located was Doc Murray. He had not lived in the country more than forty-six years and knew nothing about it before coming to Carrizo Springs. He first stated that the west prong, above the confluence, was known as the San Ambrosia Creek, and that the north prong was the Olmos and that Caracol Creek was west of the San Ambrosia (it is shown by other evidence to be a tributary of the Olmos from the west, and therefore east of the San Ambrosia). Doc's confusion was further illustrated by his statement that the San Ambrosia was east of Olmos Creek when it is unquestionably west, and that Rositas de San Juan was named for a Mexican, "some big Mexican." It is shown by other evidence to mean roses of St. John, and that the flower found on the button willow is called by the Mexican people Rositas de San Juan, and that button willows are to be found where the old San Antonio and Presidio road crosses the Olmos Creek (sometimes called the San Juan Creek). Doc testified that Rositas de San Juan was on the San Ambrosia Creek and later he said it was miles north of San Ambrosia Pass. This last statement places it on what is now called the Olmos Creek, rather than the west prong or what is now called the San Ambrosia above the confluence of the two prongs. Doc doesn't show how he learned where Rositas de San Juan was located. His statements are as consistent with appellees' contention as they are with appellant's contention, as appellees' exact contention is that the Rositas corner is miles north of San Ambrosia Pass. The record shows that all the surveyors went up the north prong and not the west prong. Smith marked a tree S. 75 W. 66 varas from his corner, which he called Rositas de San Juan in 1853. It was located where an old road crossed the north prong of the San Ambrosia Creek. In 1884 Locke, while surveying the Rivas Grant, found this same tree. Maps in the General Land Office for many years showed this corner to be located where appellees contend its true location is. O. H. Hector was referring to this same tree when surveying I. & G. N. Survey No. 20, Block 9, in 1888. C. R.

Hedke found the same tree at the same point when surveying in 1939. All of this testimony is not to be overcome by the confused statement of Doc Murray, that Rositas de San Juan was located on the west prong of the San Ambrosia. It seems that all Doc knew about the corner was the rankest kind of hearsay. Even if it was general reputation it did not go back far enough to be of value. The corner was located in 1853, and Doc knew nothing of the country prior to 1890. Such evidence carries no weight. Dunn v. Land, Tex. Civ.App.. 193 S.W. 698; Stroud v. Springfield, 28 Tex. 649; State v. Dayton Lumber Company, Tex.Civ.App., 159 S.W. 391; Maxcy v. Norsworthy, Tex.Civ.App., 19 S. W.2d 926; Thatcher v. Matthews, Tex. Civ.App., 183 S.W. 810.

The best evidence of the location of the Rositas corner was Smith's map accompanied with his field notes. Burkett v. Chestnutt, Tex.Civ.App., 212 S.W. 271; State v. Atlantic Producing Company, Tex. Civ.App., 110 S.W.2d 953; Boon v. Hunter, 62 Tex.582, 589; Stover v. Gilbert, 112 Tex. 429, 247 S.W. 841.

The evidence offered by the appellant being general, descriptive and indefinite, raised no fact issue as against the specific, definite and competent evidence of appellees. Taylor v. Higgins Oil & Fuel Company, Tex.Civ.App., 2 S.W.2d 288; Kirby Lumber Company v. Adams, 127 Tex. 376, 93 S.W.2d 382.

In boundary, excess or vacancy suits involving old grants and old surveys, where no living witness can testify as to original conditions and facts, the courts, wherever there is specific, definite evidence of facts existing as of the date of the grant or survey, as opposed to general, indefinite or descriptive evidence, decide such cases usually as a matter of law rather than fact. Short v. W. T. Carter & Bro., 133 Tex. 202, 126 S.W.2d 953, and authorities therein cited.

Appellant complains because the original grant to Antonio Rivas called for only twenty-five (25) leagues of land, while the land now claimed by appellees is more than thirty-six (36) leagues. It will be remembered that the Rivas Grant was a grant not by the State of Texas, but by a prior sovereign. Whatever was contained in the original Rivas grant never did belong to the State of Texas. The original Rivas Grant called for named boundaries and natural markers for corners. These boundaries and corners were definitely located by J. Varian Smith in his survey of 1853. The State recognized this survey and issued its patent based thereon in 1872. It is now possible to follow the footsteps of J. Varian Smith as he made his survey of the Antonio Rivas Grant. Where the footsteps of the surveyor can be followed the quantity called for becomes of no consequence. Benavides v. State, Tex.Civ. App., 214 S.W. 568; Welder v. State, Tex. Civ.App., 196 S.W. 868.

In Corrigan v. State, 42 Tex.Civ.App. 171, 94 S.W. 95, beginning on page 100, will be found a quotation from the Supreme Court of the United States, in United States v. Sutherland, 19 How. 363, 364, 15 L.Ed. 666. This quotation is quite appropriate and is here adopted as a part of this opinion, as much so as if fully copied here.

The trial court properly rendered judgment non obstante veredicto and accordingly the judgment will be affirmed.