## SULLIVAN *v.* TEXAS.

ERROR TO THE COURT OF CIVIL APPEALS FOR THE THIRD SU-
PREME JUDICIAL DISTRICT OF THE STATE OF TEXAS.

No. 91. Argued December 20, 1907.—Decided January 6, 1908.

Where the highest court of the State dismisses an application for writ of
error for want of jurisdiction, the judgment of the lower court becomes
the judgment of the highest court of the State to which the case can be
taken, and the writ of error will properly run to it from this court.

If the constitutional question is distinctly presented to the state court on
motion for rehearing, and is considered and decided adversely, it is
properly presented in time and this court has jurisdiction to review the
judgment under § 709, Rev. Stat.

This court determines for itself whether an act of the legislature of a State
amounts to a contract within the impairment of obligation clause of the
Federal Constitution.

A state statute confirming a grant of the former sovereign and specifying
the area and providing for a survey to ascertain metes and bounds and
for filing the field notes does not amount to a contract within the im-
pairment clause of the Constitution that the State will abide by the
survey even though it includes more than the original grant.

The act of February 10, 1852, of Texas, confirming Mexican grants, did not
amount to a legislative contract to abide by the surveys to be made
of such grants; nor is the act of September 3, 1901, directing actions
to be brought to recover land wrongfully in possession of grantees in ex-
cess of the amount of the original Mexican grant, but included in the
survey made under the act of 1852, unconstitutional as impairing the ob-
ligation of a contract.

95 S. W. Rep. 645, affirmed.

THIS case comes to us from a state court and our jurisdic-
tion is invoked on the ground of a law of the State charged
to work an impairment of the obligation of a contract. The
facts are that in 1834 the Mexican State of Tamaulipas granted
to Pedro de la Garza a tract of land. The grant, signed by
the governor, recited that the grantee had paid the appraised
value, $204; that the grant contained "six and a half leagues
of pasture land for large cattle, comprehended in the bound-
aries, angles and demarkations which appear in the attached
map, countersigned with the seal of this government, signed
with a rubric by my secretary, which, for greater distinctness,

are set out in the present title in the following mode: El Alcatraz and San Antonio of the waterfall, east to west on the north side; San Antonio and the Sacramento, north to south on the west; Sacramento and San Francisco, west to east on the south; San Francisco, San Pedro and El Alcatraz, south to north on the east. The pasture land is bounded on the north by Los Olmos Creek and on the rest of the sides by vacant lands."

Accompanying the grant was a plat showing an irregular hexagon and a survey made by Antonio Canales, as follows:

"The inclination to the southeast of the Olmos Creek figured in the survey of the irregular hexagon, which appears depicted, which contains six leagues of pasture land for large cattle and 20,782,500 square varas according to the units fixed by the law of the State for agrarian measures. The angular boundaries and most notable places which were defined were the following: A, boundary of the Alcatraz; B, boundary of San Antonio of the waterfall; C, boundary of Sacramento; D, boundary of San Francisco; r, lateral boundary of this pasture and angular of the Santa Rosa de Abajo, called San Pedro; e, lake of the sheep pen; m, n, ponds and heights of the waterfall; o, the little pond. The rectangle h, i, g, l, was ceded to this pasture by citizen Pedro Villareal, of which it was defined in the terms which appear in the file of this survey, A. M. B., the Olmos Creek. The survey was made with the greatest exactness, remeasuring the cord every half league and correcting the ten leagues of declination to the northeast, which the compass needle has in these lands. This pasture is bounded on the north by the creek, on the east by the pasture of Paistle and on the rest by vacant lands.

"Carmargo, Dec. 5th, 1832.            ANTONIO CANALES."

Thereafter Tamaulipas became a part of Texas, and that State, on February 10, 1852, passed an act confirming this among other grants. Laws, General, Fourth Legislature, ch. 71, p. 63. The act of confirmation, so far as is material, provided by § 1 "that the State of Texas hereby relinquishes

all her right and interest in the following-described lands to the original grantees thereof, their heirs and legal assigns, to wit: County of Starr . . . (103) Pedro de la Garza, six and one-half leagues, called 'Santa Rosa,' . . ." Section 2 of the act is as follows (p. 71):

"SEC. 2. That it shall be the duty of those claiming any of the lands named in this act, to have the same surveyed by the district or county surveyor of the county in which the same may be situated, and upon the return of the field notes thereof to the General Land Office, the Commissioner is hereby authorized and required to have the same plotted on the maps of his office, and issue patents for the same in accordance with existing laws; provided, that no patent shall issue for a less amount than the original grant. That the owners of said lands shall be required to pay the taxes due on the same, from the date of the organization of the respective counties herein mentioned; which taxes shall be paid, and legal vouchers for the same exhibited to the Commissioner of the General Land Office before the patent to the same shall issue."

In May, 1859, Felix A. Blucher, a deputy district surveyor of the district, made a survey, the field notes and a plat of which were in August, 1869, filed in the General Land Office. The field notes commenced with the statement:

"Field notes of a survey of Eight leagues and twelve labores of land made for Wm. G. Hale and F. J. Parker the assignees of Pedro de la Garza this being the quantity of land to which they are entitled by virtue of a grant from the State of Tamaulipas dated on the 3rd day of July A. D. 1834. Surveyed in accordance with an act of the legislature of the State of Texas, approved Feb'y 10th, 1852, and entitled 'An act to relinquish the right of the State to certain lands therein named this being part of confirmation numbered 103 for the County of Starr in said Act.'"

This survey was not approved, and the field notes were indorsed by the Commissioner of the General Land Office in these words: "Closes partly all but the approximate area.

found with apportioning errors is 267,552,959 sq. vrs.—10 Leagues 17½ Labores or 55,252,959 sq. vrs. too much. Aug. 21, '69, Richardson, $2.00."

No patent was ever issued for the land or any part of it. On September 3, 1901, the legislature of the State of Texas passed an act, § 11 of which is as follows:

"Sec. 11. The attorney general of this State is hereby directed and required to institute and prosecute, in the name of the State of Texas, such suits as may be necessary to recover from the person or persons in possession thereof or claiming title thereto, all lands which are held or claimed under titles emanating from the Spanish or Mexican governments where no valid evidence of such grants are to be found in the records or among the files of the General Land Office; and also such suits as may be necessary to determine the exact location and boundaries of such lands, where the evidence on file in the General Land Office does not sufficiently identify the land claimed; and such suits shall be brought, prosecuted and tried in the District Court of Travis County, Texas."

In pursuance of this section this suit was brought, the original petition having been filed September 24, 1902.

The defendant holds title under the original grantee of the State of Tamaulipas, and was and had been for many years in possession of the entire tract of over ten leagues surveyed by Blucher, claiming title to all in his possession. The State, conceding his title to six and one-half leagues, contended that all in excess was still its property. The case was tried before the court without a jury and a judgment entered in behalf of the State for three tracts, which the court found to be outside the boundaries of the original Mexican grant. The Court of Civil Appeals in and for the Third Supreme Judicial District of the State affirmed this judgment. 95 S. W. Rep. 645. A petition for rehearing was filed, in which the protection of the contract clause of the Constitution of the United States was specially invoked. In denying the motion for a rehearing the court considered this constitutional question and decided it

adversely to the plaintiff in error. Thereupon a petition was presented to the Supreme Court of the State for a writ of error to review the judgment of the Court of Civil Appeals, but that court dismissed the application for want of jurisdiction.

*Mr. Charles W. Ogden,* with whom *Mr. J. C. Sullivan* was on the brief, for plaintiff in error:

This court will ascertain and determine for itself, in a case of this character, whether or not a contract existed, and, if so, its import, and whether it has been impaired by state legislation. *Muhlker* v. *Harlem Railroad Co.,* 197 U. S. 571; *Kies* v. *Lowrey,* 199 U. S. 239; *H. & T. C. Ry.* v. *Texas,* 177 U. S. 76; *St. Paul Gas Light Co.* v. *St. Paul,* 181 U. S. 147.

The act of February 10, 1852, confirming the grant in controversy and providing for a settlement of its boundaries by an official survey, was a proposition made by the State to the landowner, which, upon acceptance, as evidenced by the survey at the request of the owner and the return of the field notes to the General Land Office, ripened into a valid contract, which was binding upon both parties thereto.

When the survey is made and the field notes thereof are returned as required by law, it is conclusive evidence against both the Government and the claimant that the land granted by the confirmation of Congress was the same described and bounded by the survey. This consideration depends on the fact that the claimant and the United States were parties to the selection, and mutually bound and respectively estopped by it.

In such a case the patent is not necessary to perfect, nor does it add anything to, the title, but only serves as an evidence thereof.

In such a case the binding force and effect of the resurvey and the act of confirmation is not dependent upon, nor can it in any manner be affected by, an inquiry into the question as to whether or not the boundaries of the grant are correct.

*Langdeau* v. *Hanes*, 21 Wall. 521; *Clark* v. *Hills*, 67 Texas, 141; *Menard Heirs* v. *Massey*, 8 How. 293; *Guitard* v. *Stoddard*, 16 How. 494; *West* v. *Cochran*, 17 How. 403; *Ryan* v. *Carter*, 93 U. S. 78; *Morrow* v. *Whitney*, 95 U. S. 551; *United States* v. *Roselius*, 15 How. 34; *Arguello* v. *United States*, 18 How. 539; *Forbes* v. *Withers*, 71 Texas, 472; *Commonwealth* v. *Pejepscut, Prop.*, 10 Massachusetts, 156; *Rutherford* v. *Grienes Heirs*, 2 Wheat. 196; *Howard* v. *Perry*, 71 Texas, 266; *Hamilton* v. *Avery*, 20 Texas, 635; *Wright* v. *Hawkins*, 28 Texas Supp. 408.

In such a case the official survey can only be avoided by the sovereign by timely allegations and proof of fraud, to which the claimant is a party. *White et al.* v. *Burnley*, 20 How. 247; *Maxey* v. *O'Connor*, 23 Texas, 234; *Smith* v. *Hughes*, 23 Texas, 249; *Elliott* v. *Mitchell*, 28 Texas, 111; *Railway* v. *State*, 81 Texas, 602; *Howard* v. *Colquhoun*, 28 Texas, 134; *Land Company* v. *State*, 1 Texas Civ. App. 621.

Section 11, of the act of September 23, 1901, when construed and enforced, as it was in this case, by the Court of Civil Appeals, as authorizing the institution by the Attorney General of this suit and the recovery herein of land to which the title of plaintiff in error and his predecessors had been perfected under the contract, as evidenced by the act of confirmation of 1852 and the resurvey thereunder and the return of the field notes to the General Land Office, impairs the obligation of said contract and is, therefore, in violation of, and contrary to, the provision of paragraph 1, of section 10, Article I, of the Constitution of the United States. *Houston & Texas Central R. R.* v. *Texas*, 177 U. S. 76; *St. Paul Gas Light Co.* v. *St. Paul*, 181 U. S. 147.

It is not too late to raise a Federal question on motion for rehearing, if the question is considered and passed upon by the state court. *Leigh* v. *Green*, 193 U. S. 85; *Mallett* v. *North Carolina*, 181 U. S. 589.

*Mr. William E. Hawkins*, with whom *Mr. Robert Vance*

*Davidson,* Attorney General of the State of Texas, was on the brief, for defendant in error:

The confirmation shown by the act of February 10, 1852, applied to the land embraced in the original grant to Pedro de la Garza, and not to the land awarded to the State of Texas by the judgment in this cause.

None of the three tracts awarded by the judgment in this case to the State of Texas was within the lines of the original grant as surveyed by Canales. *Ryan* v. *Carter,* 93 U. S. 82; *Langdeau* v. *Hanes,* 21 Wall. 529; *Clark* v. *Hills,* 67 Texas, 145; *Corrigan* v. *State of Texas,* 94 S. W. Rep. 95; *Love* v. *Barber,* 17 Texas, 320; *Welder* v. *Carroll,* 29 Texas, 333.

Whether considered by itself alone or in connection with the Blucher resurvey of the Santa Rosa de Arriba grant, the act of confirmation of February 10, 1852, by the legislature of the State of Texas, did not constitute a contract between the owners of said grant and said State concerning the lands which were awarded by the state courts to the defendant in error, the State of Texas.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

By the action of the Supreme Court of the State the judgment of the Court of Civil Appeals became the judgment of the highest court in the State to which the case could be taken, and hence the writ of error properly ran to that court. The constitutional question, although not raised theretofore, was distinctly presented in the petition to the Court of Civil Appeals for a rehearing, was considered by that court and decided adversely to the plaintiff in error. This court, therefore, has jurisdiction. *Mallett* v. *North Carolina,* 181 U. S. 589, 592; *Leigh* v. *Green,* 193 U. S. 79; *French* v. *Taylor,* 199 U. S. 274.

Coming to the merits, it is obvious that the act of 1852 was simply a confirmation of grants made by the Mexican States.

There is nothing in it which suggests the thought of new grants or of addition to old ones. The first section declares that the State "relinquishes all her right and interest in the following-described lands to the original grantees thereof," and names the amount of land included in this grant so relinquished, six and one-half leagues. The second section makes it the duty of claimants to have surveys made of their existing grants. The third section makes provision in case of the loss of the "original title papers of lands claimed by this act," while § 5 speaks of "the confirmation herein extended to the lands mentioned in this act."

But it is contended that there was an existing Mexican land grant binding upon the State of Texas as the successor of the former government; that the act of 1852 not only confirmed the grant, but also by the second section provided for a settlement of its boundaries through an official survey; that this was a proposition made by the State to the claimant of the grant which upon acceptance, as evidenced by the survey at the request of the owner and the return of the field notes to the land office, ripened into a valid contract; that when the survey was made and the field notes returned, as required by law, it became conclusive evidence against both the State and the claimant that the land surveyed was that granted by the Mexican State and confirmed by the legislature of Texas. This argument makes the survey the pivotal fact upon which the question of contract turns. Of course, whether there was or was not a contract is a question which, in a case like the present, this court must determine for itself. *Jefferson Branch Bank* v. *Skelly*, 1 Black, 436, 443; *McCullough* v. *Virginia*, 172 U. S. 102, 109; *H. & T. C. Railway* v. *Texas*, 177 U. S. 66, 77; *St. Paul Gas Light Company* v. *St. Paul*, 181 U. S. 142, 147; *Muhlker* v. *Harlem Railroad Company*, 197 U. S. 544, 570.

It will be perceived that § 2 does not name the individual to act for the State, but only designates certain officials, any one of whom may make the survey, and imposes a duty upon the claimant of causing the survey to be made. It does not

prescribe the time within which the survey must be made. In fact, it was not made until seven years after the passage of the act, and the field notes were not filed until ten years after that. The purpose of the act was to enable the claimant to acquire a patent as better evidence of title, with a more accurate description of boundaries. The surveyor is not named as an agent of the State. On the contrary, an official act, that of survey, was authorized to be made at the instance of the claimant, but a mere surveyor is not by virtue of his office empowered to change boundaries. Those were given in the original Mexican grant, and his function was simply to resurvey, making the description more definite and certain. It could not have been within the contemplation of the legislature that this surveyor, picked out by the claimant, should have power to bind the State, by the mere matter of survey, to a grant nearly double the size of that which it confirmed by this statute of relinquishment. It must be borne in mind that the original grant was not a float—that is, a grant of so many acres to be located inside of a larger tract, in which the surveyor might have a discretion in selecting the particular tract—but it was a grant by metes and bounds, and the sole function of the surveyor was ministerial, to locate the tract and more fully describe those metes and bounds.

In all these proceedings the substantial elements of a contract are lacking. The State of Texas, succeeding to the sovereignty of the former government, recognized all that might, under any circumstances, be considered its international obligation and confirmed the title which had been made. It made no grant of additional land. It simply relinquished all claims to that which had been granted by the former sovereign and confirmed the title made by that grant. It received no consideration. As the description in the original survey was defective, it provided means for perfecting that description and authorized a patent, which is the highest evidence of title. On the other hand, the grantee, holding a grant from the State of Tamaulipas, received from the State of Texas no grant or

promise of additional land, but simply a declaration of its willingness to recognize and confirm the Mexican grant. He paid nothing to the State, but was only accorded by it the means of making his title definite and certain and the boundaries of his grant beyond question. In short, it was simply a proceeding established by the law of the State for making clear and certain the boundaries of grants which the State was willing to recognize, and in that proceeding a certain official of the State was charged with the ministerial duty of making a survey. He was given no authority to enlarge or diminish the grant, but only to ascertain what the real boundaries were. Further, the State has never given a patent, although this suit was not commenced for fifty years after the act of relinquishment, forty-three years after the survey and thirty-three years after the filing of the field notes in the state land office.

The decision of the Court of Civil Appeals was right, and its judgment is

*Affirmed.*