CROSBY et al. v. STEVENSON et al.

(Court of Civil Appeals of Texas. Amarillo. April 26, 1913.)

1. BOUNDARIES (§ 3*)—NATURAL OR ARTIFICIAL OBJECTS—COURSE AND DISTANCE.

Course and distance will control natural marks or boundaries, because it is apparent on the face of the grant that the natural or artificial objects were inserted by mistake, or were laid down by conjecture, and without regard to rule.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 3–41; Dec. Dig. § 3.*]

2. BOUNDARIES (§ 6*)—LINES AND CORNERS—ORDER—REVERSAL.

The order in which a surveyor gives the lines and corners in his certificate of location is of no importance in finding the true position of the survey, since the location as determined by reversing the courses is as lawful and persuasive as following the order in the certificate.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 47–57; Dec. Dig. § 6.*]

3. BOUNDARIES (§ 3*) — IDENTIFICATION OF SURVEY—FOOTSTEPS OF SURVEYOR.

The rule that in the identification of a survey the footsteps of the surveyor on the ground should be followed by whatever rule they may be traced cannot be applied, unless the survey and the footsteps of the surveyor are actually found and identified.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 3–41; Dec. Dig. § 3.*]

4. BOUNDARIES (§ 3*)—LOCATIVE CALLS—IMPORTANCE—ADJACENT SURVEYS.

In determining the relative importance of locative calls, designations for adjacent surveys are artificial objects in determining the boundaries of grants.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 3–41; Dec. Dig. § 3.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

**5. BOUNDARIES (§ 3*)—BEGINNING CORNER.**

The beginning corner in the plat or certificate of a survey is of no higher dignity or importance in locating it than any other corner therein, since the beginning or intermediate call may be controlling when read in the light of the surrounding facts and circumstances.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 3–41; Dec. Dig. § 3.*]

**6. BOUNDARIES (§ 37*)—AGREED BOUNDARY— EVIDENCE.**

In trespass to try title to a survey of school lands, evidence *held* insufficient to establish an agreed boundary.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 184–194; Dec. Dig. § 37.*]

**7. PUBLIC LANDS (§ 175*)—SCHOOL LANDS— AGREEMENT OF RESURVEY—ACCEPTANCE BY LAND OFFICE—CONDITION PRECEDENT.**

It is a condition precedent to the consummation of an agreement for the resurvey of school lands by a state surveyor as authorized by Rev. St. 1895, arts. 4251–4263c, that the resurvey be accepted by the land office, unless waived by the parties.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. § 175.*]

Appeal from District Court, Carson County; F. P. Greever, Judge.

Action between Howard B. Crosby and others and N. A. Stevenson and others to establish a boundary line. From a judgment in favor of the latter, the former appeal. Reversed and remanded.

Geo. S. Walton, of Austin, and Goree & Turner and Stephens & Miller, all of Ft. Worth, for appellants. R. E. Taylor and W. T. Allen, both of Henrietta, for appellees.

HENDRICKS, J. In deciding this cause and the matter of boundary the inserted map indicates the conflict involved in accordance with the key, and the light and heavy dotted lines manifested upon same; but the record is so voluminous with such a multitude of facts it is difficult to illustrate the controlling issue, which of itself may be rather simple. Surveyor Maddox in 1874, in accordance with a scheme of surveying which began in Lipscomb county (the northeast county of the Panhandle), established in Hansford county (immediately west of Lipscomb) certain corners on and near Palo Duro creek, and then ran west in the same county to what was then known as Rabbit Ear creek (now known as the Coldwater), and established several connecting corners on and near this creek in block No. 2, G. H. & H. Ry. Co. survey, in the western portion of that county, and finally, and from one of these established corners on the Rabbit Ear creek, in said block close to the west line of Hansford county, he continued on west and south in Sherman county, following the west line of Block 45, in said county, and thence on to the Canadian river; meandering this river east into Hutchinson county, where north of said river this land is situated, and the identity of the river surveys relative to the matters involved here are determined and fixed, this surveyor then projected, without any actual survey, block 5—T, from his work on the Rabbit Ear creek, in Hansford county, tying the same to the southeasterly portion of block No. 2 G. H. & H. Ry. survey in said county, extending said block 5—T from said block 2 down into Hutchinson county. From the river base established upon the ground, this same surveyor, through intermediate surveys, projected north of the Canadian river the headright surveys partially shown upon this map, and designated as the Neil, the Hall, the Walters, and the Bason, and the map first constructed by the land office, based upon the work of Maddox, of course indicated a vacancy between the said headrights and 5—T, as that block tied to block 2, G. H. & H. Ry. Co. survey, in Hansford county, with connections upon the Rabbit Ear creek, and 5—T was never closed with and never intended to meet the headrights projected from, and connected to, the basic river surveys. The extent of the vacancy between 5—T with its connections on Rabbit Ear creek, and the headrights connected to the Canadian river, could not, of course, become definitely known until actually surveyed. It seems, however, to be conclusive in this record that the headright surveys mentioned constructed from the connections on the river have never been in dispute and their relative positions from the identified points on the river from the time determined by Maddox have never been changed; the variations of distance and location of these headrights by different work being so slight as to be immaterial. After this work by Maddox in 1874, Surveyor Summerfield in 1879 put in block R—2, tying it on to 5—T, and, from this work another map was made by the land office, at the same time moving block 5—T over a mile further north than indicated by the first map (delineated upon the work done by Maddox), moving it opposite and still north and east of the headrights, the "Neil" and the "Hall." This subsequent map still indicated a vacancy between the headrights (the Neil, the Hall, the Walters, and the Bason) and block 5—T, and in 1881 E. C. McLean, another surveyor, for the purpose of absorbing this vacancy, put in block M—24 involved in this suit. The situation, according to the maps at the time McLean did his work, and the map measurement resultant from same, placed 5—T at this time 1,312 varas further south and 254½ varas further east than was thereafter determined, which, of course, would make the real situation of that block that much further north and west; and this real situation was determined by State Surveyor Gray, assisted by Deputy Surveyor Spiller, who in 1890, by course and distance, from the correct connections on the Rabbit Ear creek, in Hansford county, established 5—T and R—2 upon the ground... Section 135, in block 5—T, the northwest corner of which was not directly ascertained by Spill-

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

er and Gray, but which was easily ascertained by Twichell from known points established by the former from course and distance, is not in dispute; and in 1908 W. D. Twichell, who made the survey, indicated by the light dotted lines, began at the actual northwest corner of 135 in block 5—T, in order to obtain survey M—24, because McLean in his field notes for section 1 of M—24, when he surveyed it, 27 years previously, said that said section No. 1 began at that corner; Twichell constructing block M—24 according to the light dotted lines, and merging it into the heavy dotted lines of the old survey, where they coincide, as indicated by the map, covered the Day Land & Cattle Company survey, as shown therein and conflicted with the other sections of the old survey to the extent indicated, the appellees contending in this cause that the real northwest corner of section 135 in 5—T, surveyed by Twichell, based upon Gray and Spiller's work, should control as a beginning corner in the constructions of M—24; the appellants asserting that McLean's northwest corner of 135, block 5—T, as the beginning corner of survey 1, block M—24, is not known, and further contending that block M—24 should not be disconnected from the headrights on the west and south, for which M—24 also calls.

In putting in block M—24 McLean in September, 1881, by the field notes of section 4 of that survey, fastened it to the Bason, the Walters, and the Hall; for section 3 in said block he called for the Neil at a point 752½ varas north of the north line of the Hall headright, and then east 23½ varas to the northeast corner of the Hall, making section 3 conform to the jog in the lines of the Neil and the Hall; and he also tied section 2 of that block to the Neil at a point 1,429½ varas on the east line of the William Neil, south from the northeast corner of same, and calls for the southwest corner of section 1 of M—24, on the east line of the William Neil 1,429 varas south from the northeast corner of that survey, and adding 1,550½ varas gives the full length of the west line of section 1, in M—24 and the northwest corner of same, and 1,212 varas east of that point is the northeast corner of section 1 and the supposed northwest corner of section 135, block 5—T. When Gray and Spiller surveyed block 5—T from the proper connnections on the Rabbit Ear creek in 1890, and actually located it on the ground, the general Land Office moved that survey, and block R—2 tied to it to a point north and west in accordance with its actual location on the ground; but with its maps the land office asserted the position of M—24 on the ground, maintaining its original status with the headrights to which McLean had fastened it and logically made it conform to section 50, M—23, in said block on the southeast located by McLean in February, 1882, and which was a part of a scheme of the McLean surveys, practically put in at the same time, the land office rejecting the survey of Twichell; and while, of course, the determination of that department upon past work is not a determination of a grant previously made, we think, however, its action in this instance is clearly correct. 5—T and R—2, tied to and following it, should be moved to an appropriate position according to its location on the ground; 5—T begins in Hansford county and ties to block 2, G. H. & H. in that county, and to the connections on Rabbit Ear creek, and were never tied to the headrights, as stated, but because the beginning corner of survey No. 1, in block M—24, begins to call at the northwest corner of section 135, in 5—T, and because certain lines of other sections in M—24 call for R—2, it does not necessarily conclude that M—24 is to follow 5—T and R—2, and is to be torn from the headrights, moved west entirely off the headrights and away from the Bason and the Walters, and logically moving it from the scheme of some of the McLean surveys made practically at the same time; and necessarily if it were not proper to tear M—24 from the headrights, and from M—23 and M—17 and 18 (to which latter three it inferentially belonged), a vacancy and not an excess was existent between

M—24 and 5—T and R—2, which was covered in 1890 by the Day Land & Cattle Company's certificate No. 21. If 5—T and R—2 were properly moved north and west (which is admitted), and if M—24 was properly retained adjacent to the headrights (which is denied), this vacancy and not an excess properly existed and this certificate appropriated the land.

In determining the above question, as well as other conflicts, and in attempting to ascertain where McLean landed for the northwest corner of survey No. 135, 5—T, it is noted that the distance between the northeast corner of the Neil survey and the northeast corner of the Robert Sikes survey (which is survey No. 54 in block M—23), is 1,550½ varas; and the original sketch returned by McLean to the General Land Office, with his field notes of block M—24, the northwest corner of survey No. 1 in that block, is just 1,500½ varas north of the northeast corner of the William Neil, and we believe with appellants that at least if you consider his field notes and calls for the headrights, and according to McLean's conception of the northwest corner of section 135, 5—T, that corner was located 1,550½ varas north and 1,212 varas east of the northeast corner of the William Neil, considering the east line of the Sikes. In short, according to the conformation of the surveys—that is, the headrights and the Sikes in M—23, and the identity of distances around the surrounding surveys, according to calls—there is a coincidence in the mathematical results of the length of these lines, which without something fixed upon the ground indicates very strongly an adherence by McLean to the southern work. If McLean two years after Summerfield's work actually established the northwest corner of survey 135, in block 5—T, at the place Twichell established it in 1908 (the latter following Gray and Spiller's work in 1890), the appellees' position would be sound. If they identify McLean's corner for 135 with the corner Twichell surveyed, it is done by conjecture without any evidence that McLean ever arrived at the same place in 1881. We have to speculate where McLean ascertained the northwest corner of 135, if he surveyed it at all in attempting to locate that corner. Twichell, who erected appellees' survey, testified that his information was that, "if block 5—T was run out by course from the known corners on the Palo Duro in Hansford county, they do not occupy the same position as if located from connections on the Coldwater." When Gray and Spiller ran out 5—T in 1890 from the Coldwater, it was found that Maddox (if not previously known) in establishing his corners on Rabbit Ear creek, from connections he made on the Palo Duro, made a mistake of 1,312 varas north and south, and 254½ varas east and west; the only evidence we have of McLean is a statement to the land office as to his connecting lines for M—24,

and it is not very clear just what McLean did, except that it is clear he did not connect 5—T with the connections on Rabbit Ear creek, and it is strongly inferable when you consider his whole statement that he intended to connect M—24 to his other work on the south, the headrights on the west, as well as to connect with the established corners on the Palo Duro. He says in his certificate: "On north side of river the surveys in B and B—2 were found and identified also surveys No. 11 and 12, in block H, and the southeast corner of survey No. 11 in block M—17, and northeast corner of survey No. 2, block M—16. The surveys in block 5—T, block R, and block M—16 and the surveys attached thereto were located by careful connections made with well-identified corners in block No. 45 for the H. & T. C. Railroad Company, they being the nearest controlling corners that could be identified with absolute certainty. See field notes of surveys No. 32, 43, and 48 in block 45 for H. & T. C. R. R. Co. in Hansford county, with which surveys connections were made. Careful connecting lines were run between the various surveys that were identified as herein above named, and their respective and relative locations are truly set forth in the certain sketch 5, in the General Land Office on the 26th day of July, 1882, showing all surveys made by me previous to that date in Hutchinson county, which sketch is hereby made a part of this certificate. The distances called for in the field notes returned by me are also referred to as evidence of the exact locations of all surveys found by me on the ground. All surveys not found by identifying corners or bearings were given the positions that course and distance from points that could be identified would give them except the surveys fronting on Canadian river. Filed 11/8/1882. Dated 18th day of Oct., 1882."

The southeast corner of survey No. 11 in block M—17 and the northeast corner of survey No. 2 in block M—18 were mentioned by him as having been identified in connection with M—24. Those sections were a part of the "various surveys" used by him in his connections for that purpose. The Land Office plat "the certain sketch 5" filed by him July 26, 1882, and in this record, clearly exhibits blocks M—17, M—18, M—23, and M—24 (the latter in controversy) as connecting by succession as adjoining surveys. After McLean surveyed M—24, there was a vacancy left by him upon the east and southeast, afterwards absorbed by section 50, in M—23, and the field notes for this section call for surveys 28 and 30 in that same block, M—23, as well as the south line of 8 in block M—24, and calling for the Bason, to which section 4, M—24, is fastened. For survey 49 in block M—23 not shown on this map, and which took up a part of the vacancy after he surveyed M—24, it is true

he calls wholly for surveys in block R—2, which it will be remembered is tied to 5—T; but it could not be contended with any degree of reason that section 49 with or without a resurvey should ever be torn out of block M—23 and follow R—2 to the north.

When McLean says in his certificate with reference to connections for M—24 that the surveys in block 5—T and block R—2 were located by careful connections made with well-identified corners in block 45 on the Palo Duro in Hansford county, we cannot construe his statement to mean that he actually ran it out from the Palo Duro like Gray, and Spiller did by course and distance from the Rabbit Ear creek; there is not a trace of him in this record as to any such work, and the probabilities from the evidence in this record are strongly against it. When he says his "careful connecting lines were run between the various surveys that were identified" the surveys in blocks B and B—2, 11, and 12, in block H, and the common corner of surveys in M—17 and M—18 were only meant, they were the ones identified; but he only says he "located" 5—T by careful connections made with the "well-identified corners" on the Palo Duro. You may "locate" by careful connections "made with well-established corners" without a survey on the ground. He ran the other connecting lines between the surveys which were "identified" but his certificate does not say he ran from the Palo Duro to block 5—T. He "located" it by "careful connections." However, assuming that he did actually survey to some point for the northwest corner of 135 in block 5—T, to get the beginning corner of No. 1 in M—24, his field notes do not call for any object, and this record is silent if he ever made any—Twichell did not find any. Appellees have to assume that McLean arrived at the same place Twichell did, whose resurvey they are relying on, when Twichell's survey is connected to the Rabbit Ear, McLean's to the Palo Duro, and an absolute absence of identity.

[1] We believe a few simple principles with reference to the location and appropriation of grants will solve this question. Necessarily "it is the purpose of the government and the locator to select a particular tract of land and designate it from the mass of the public domain." Stafford v. King, 30 Tex. 259, 94 Am. Dec. 304. Of course, this appropriation in the order of strength and dignity, according to natural or artificial objects, or course and distance, should control, where applicable; but it was begun to be declared as early as the case of Hubert v. Bartlett's Heirs, 9 Tex. 104, that "there are many cases where the course and distance will control natural marks or boundaries, as where it is apparent on the face of the grant that these (natural or artificial objects) were inserted by mistake, or were laid out by conjecture and without regard to rule."

We all know they are not absolute rules of law, and as Chief Justice Gill expressed it in the case of Goodson v. Fitzgerald, 40 Tex. Civ. App. 626, 90 S. W. 900, "at most, they are rules of evidence and are relative in their application," and as Justice Gould expressed it in the case of Robinson v. Doss, 53 Tex. 507, "to hold otherwise would be to give a greater importance to the rule itself than to the reason of the rule"; and while the applicability or nonapplicability of the seniority of these rules, according to their strength and dignity, are not in question here for the location of the surveys involved, the principles enunciated are illuminative—if an alleged controlling call in this case is clearly shown to have been a mistake, or is one purely conjectural; and in that case "that rule must be adopted which is most consistent with the intention upon the face of the patent read in the light of the surrounding facts and circumstances." Stafford v. King, 30 Tex. 257, 94 Am. Dec. 304. We think it is clear from this record that the appellees ground their case upon the beginning call of survey No. 1, block M—24, beginning at the northwest corner of survey No. 135, block No. 5—T; and, although block R—2 was originally tied to 5—T (to which former block, R—2, some other surveys in M—24, are tied), still the solution of the location of block M—24 "hearks" back to 135, 5—T, and appellee claims under a resurvey by Twichell in accordance with that theory. In a sense there is a partial break in the calls of the sections by McLean in M—24, all the sections in said survey not having been consecutively tied to each preceding section in every instance, but M—24 is shown conclusively to have been an homogeneous survey by him and cannot be torn apart, and they have necessarily so treated it.

[2, 3] "The order in which the surveyor gives the lines and corners in his certificate of survey is of no importance to find the true position of the survey. Reversing the courses is as lawful and persuasive as following the order of the certificate." Phillips v. Ayres, 45 Tex. 601. Again quoting the Supreme Court for the principle only there invoked: "Appellee relies upon the oft-announced doctrine that the actual identification of the survey, the footsteps of the surveyor upon the ground, should always be followed by whatever rule they may be traced. Stafford v. King, 30 Tex. 257 [94 Am. Dec. 304]. This doctrine, however, cannot be invoked unless the facts show it to be applicable. The actual survey must be found and identified. The footsteps of the surveyor must be traced before course and distance should be ignored. Anderson v. Stamps, 19 Tex. 465; Robertson v. Mosson, 26 Tex. 248. To extend the east and west lines beyond the distance stated in the patent, it devolved upon the appellee to prove that a line north of that claimed by appellant was

actually traced by the surveyor." Williams v. Winslow, 84 Tex. 376, 19 S. W. 515. While this is not so much a case of extending lines as it is one of changing them entirely, and reconstructing practically a different survey by tearing lines from what is ascertained to be known and placing them at a place, where it is not shown the surveyor knew existed, however, we think the principle in the Winslow Case, supra, applicable.

[4] With reference to the determination of the relative importance of locative calls, designations for "adjacent surveys" are within the category of artificial objects in determining the boundaries of grants. Phillips v. Ayres, 45 Tex. 606. It is true we have no evidence here that the headrights at the time McLean made his survey of M—24 were marked and well known upon the ground, which condition evidently has to occur to fully invoke the principle of calls for adjacent surveys as controlling calls; however, this evidence is replete with the suggestion that at the time he made said survey, and subsequently, from the maps and field notes the headrights could be easily located. If he assumed the proper locations of these headrights, which he, of course, did, otherwise it was his duty to have run them out before he tied on to them as the vacancy to the north and east of them was what he was after, his assumption was correct; although he may have assumed the position of the headrights in his calls for adjacent surveys; still, this record showing such easy ascertainment from the bearings upon the river 12 or 13 miles away of the correctness of said headrights, the appellants' proposition is analogous to the position, and almost complete, of making the unknown yield to the known. Sanborn et al. v. Gunter & Munson, 84 Tex. 297, 17 S. W. 117, 20 S. W. 72.

[5] Again, on this particular proposition, the authorities are settled "that the beginning corner in the plat or certificate of survey is of no higher dignity or importance than any other corner of the survey." Phillips v. Ayres, 45 Tex. 607. Of course, this principle is like many others, applicable to locative grants. A beginning call, as well as an intermediate call, may be the controlling call, "read in the light of the surrounding facts and circumstances"; but here we have no light by the surrounding facts and circumstances to make this beginning call important, or even of equal dignity with the other calls for the headrights, and our judgment is that the other calls should prevail.

[6] The defendants Stevenson, McFarland, and Chisum especially pleaded an agreed boundary with the appellants Crosby and Hatcher, and we do not think the evidence sufficient to prove the issue. There seems to have been some agreement in writing, not introduced in evidence, as to the settlement of the lines by the surveyor Twichell, providing for a resurvey of the land. Mr.

Twichell testified: "In tying M—24 on to R—2 and 5—T, I followed the calls of McLean's original field notes and ran course and distance called for in those field notes." On analysis he means, of course, "course and distance" from the northwest corner of 135 M—24, in accordance with the Gray survey, and as we held, without any proof, that McLean ever arrived at that point. In a letter to Judge S. H. Cowan of Ft. Worth, in explanation of his work, among other things, he said: "I ran the block out from this beginning (meaning the north west corner of 135, block 5—T) ignoring the calls for headrights on the west as they could be reached by no other course nor distance. All the settlers agreed to abandon the calls on the west and south, and accept course and distance, and the state contended that the land in which they still have an interest could not hold the excess under the original field notes." There is no testimony in this record that Crosby and Hatcher agreed to disregard the calls on the west and south and ignore the calls for the headrights, and run out M—24 in accordance with course and distance with Gray's survey, and Mr. Twichell did not so say on his examination with reference to Crosby's participation in the matter, with whom he had a conversation in regard to same, but summed up the matter finally by saying, "As to what I instructed Crosby I was to do, I was to retrace the lines of the original surveyor as near as science would enable me to do it. I was intending to retrace the lines of the original surveyor"—which the evidence does not show that he ever did. If appellees are dependent upon any agreement with Crosby by letter or otherwise for the purpose of binding Hatcher, there is not sufficient agency shown that Crosby, who was a joint owner of the land with Hatcher, could bind him. It is true the testimony does show that Hatcher agreed to a removal of the fences, and instructed Stevenson to move to the lines made by Twichell, but it is not shown that this was in accordance with the agreement the other settlers had with Twichell to disregard the calls for the headrights, and survey the land only by course and distance from R—2 and 5—T.

It is also true that Stevenson said that he did not agree with any of them as to the manner in which Twichell was to run out the lines, and further said that "Mr. Hatcher and I signed an agreement as to the lines— that they should be where Twichell set them; the only agreement I had with these men was in writing." The whole record is cogent with the idea and deducible direct from Twichell's testimony that he arbitrarily disregarded the calls for the headrights, and the theory that M—24 should be run out so as to retain its position with the southern work. He testified explicitly "that they [meaning the appellees] agreed to abandon all

calls for the headrights on the west and south" in addition to what he wrote to Cowan. While Stevenson might not have agreed directly as to the manner in which Twichell was to run out these lines, the record convincingly bespeaks another agreement, distinct from any written agreement, to the effect that the headrights on the southern work should be disregraded entirely. The principal explanation we have as to what constituted the written agreement is contained in the letter from Twichell to Cowan, mentioned above, where he says: "I have surveyed practically all the land north of the Canadian and south of block T, doing the work for Mr. Munson and others, myself working as state surveyor, regularly appointed under the act providing for such work in the Acts of 1887, title 99 (89) R. S. 1895. This act is referred to in my corrected field notes. Aside from this act, the landowners in M—24 all signed an agreement to make the general survey under the act referred to for the purpose of determining the correct line. I think your client signed this agreement, and that would probably prevent further difficulty."

[7] Mr. Twichell in his corrected field notes of M—24, upon which appellees depend, does say that the survey was made by him "as state surveyor by virtue of title 79 (meaning 89) c. 1, R. S. Civil Statutes of 1895," which act clearly contemplates that the corrected survey shall be accepted by the land office, which was never done in this instance; and if this written agreement for Twichell "to make the general survey under the act referred to" was the only agreement Stevenson made, or the others for that matter, the acceptance by the land office of this resurvey is a precedent condition to the consummation of the agreement, unless waived by Hatcher and Crosby. If the side agreement was made to disregard the other calls in constructing the survey, and the written agreement embodies the legislative act, under which Twichell as state surveyor made the survey, and this present record forces us to that conclusion, the evidence must show acquiescence by Crosby and Hatcher in the collateral agreement and a waiver by them of the other, and when Hatcher instructed Stevenson to move the fence, if he was not aware of the other agreement, and did not waive by his acts the failure of the Commissioner of the General Land Office to accept Twichell's survey, he would not be bound—waiver imports knowledge and circumstances not in this record. This discussion is referable to the matter of agreement only. As to the matter of acquiescence after the fence was moved, the testimony shows correspondence with the Commissioner of the General Land Office in regard to his acceptance of the survey into the year 1909, and this suit was filed in September, 1911.

It is not incumbent upon us to discuss acquiescence to prove agreed boundary or acquiescence distinct of itself; we hold this evidence insufficient.

We have concluded to reverse and remand this cause as a whole without intending to disturb the judgment previously rendered in the cause of Geo. B. Lucas v. Geo. G. McFarland (No. 269) 156 S. W. 1109, on the docket of this court. We disposed of that cause in accordance with the field notes and the matters there presented, and it can take care of itself, and if the evidence of agreed boundary is the same in this cause, upon another trial, as in this trial, this case is remanded with instructions to render a judgment in accordance with this opinion.

Reversed and remanded.