BENAVIDES et al. v. STATE et al.
(No. 6101.)

(Court of Civil Appeals of Texas. June 11, 1919. On Motion for Rehearing, Oct. 8, 1919.)

1. BOUNDARIES ⬅3(5)—DESCRIPTION—CALLS—CONTROLLING ELEMENTS.

A call for a natural object will not control a call for course and distance, when it appears that the same was made by mistake, or upon an erroneous conjecture.

2. BOUNDARIES ⬅37(3)—DESCRIPTION—CALLS—MISTAKE—EVIDENCE.

In an action involving a boundary of a survey calling for the "head of the drain of M., deceased," evidence held to show that such call was inserted by mistake, where the call for distance would cause a discrepancy of 2.7 miles.

3. BOUNDARIES ⬅3(5)—DESCRIPTION—CALLS—CONTROLLING ELEMENTS—DISTANCE AND NATURAL OR ARTIFICIAL OBJECTS.

While distance is often the most uncertain call in field notes, there are no set rules as to whether a call for natural or artificial objects or a call for distance should control, and, in the absence of elements showing that a call for distance was inserted by mistake, it will control the location of the survey.

4. BOUNDARIES ⬅3(9)—DESCRIPTION—CALLS FOR QUANTITY.

While quantity in a survey is immaterial when the lines and corners can be located with reasonable certainty by reference to calls for natural or artificial objects or for other surveys, when they cannot be thus located quantity becomes a material circumstance, there being no presumption of law that the surveyor made a mistake in his call for quantity.

5. JUDGMENT ⬅736 — RES ADJUDICATA — TITLE IN BOUNDARY.

A decision as to title not involving boundaries is not res adjudicata in a suit to establish boundaries not involving title.

On Motion for Rehearing.

6. BOUNDARIES ⬅4—DESCRIPTION—CALLS—"CANADA."

The Spanish word "cañada," when used as a call in field notes, means valley.

7. BOUNDARIES ⬅3(5)—DESCRIPTION—CALLS—CONTROLLING ELEMENTS.

In an action involving a boundary of a survey, a call for "the lands of the Rio Grande," if held to refer to the back lines of adjacent porciones, will be rejected, when to adopt it would be to disregard the calls for course, distance, quantity, and the express configuration of the survey.

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Suit by the State of Texas and others against Francisca Pena Benavides and others. Judgment for plaintiffs, and defendants appeal. Affirmed, and rehearing denied.

Hicks, Phelps, Dickson & Bobbitt, of San Antonio, and N. A. Rector, of Austin, for appellants.

T. C. Mann, of Laredo, for appellees, Jesus Ma. Martinez and others.

C. M. Cureton, Atty. Gen., W. F. Schenck, Asst. Atty. Gen., and Black & Smedley, of Austin, for appellee State.

Findings of Fact.

JENKINS, J. On January 2, 1848, the Governor of Tamaulipas granted to Jesus Benavides two leagues of land, which had been

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

surveyed for him by Canales, the Surveyor General of that state, on April 25, 1835. This grant is known as the Pedernal.

The only field notes or other description of this survey consists of a plat and explanations thereof as follows:

Explicacion de los Demarcaciones.

a. Lindo. de la Cabeca de la Canada del Defto. Mig.
b. Yd del Matamos.
c. Yd del Mesquite.
d. Yd de las lomas del Jabali.
f. Derramadero de San.
g. Yd de Charco Rendodo.
h. Yd de los Abritos.
i. Yd del Atas.

Explanation of the Survey.

The area embraced by the trapezoid which appears delineated is that of two leagues for large stock, surveyed and marked off on the courses which the plat indicates after correcting the ten degrees declination to the northeast which the needles in these parts have.

The pasture land remained bounded on the southwest with lands of Rio Grande, on the southeast with those adjudicated to Mier, on the northeast with the Jabali pasture lands, Charco Redondo and El Gruyo, on the northwest with the Matamos.

Ciudad Guerrero, April 25, 1835.

Licentiate Canales.

The figures 40 on the above sketch were intended by Canales to be 400 and mean 400 cuerdas (20,000 vrs.). The figures 100 mean 100 cuerdas (5,000 vrs.). The figures 11 mean 11 cuerdas (550 vrs.).

The original field notes of the Grullo, Jabali, and Sacatosa consist of similar plats and explanations. The original field notes of the Charco Redondo are not in the record, but the field notes of that survey, as surveyed under the act of February 10, 1852, and patented by the state, are in the record. The Grullo, Jabali, and Sacatosa have also been patented. According to the calls made by Canales, these surveys should have been contiguous to each other, but in resurveying them an excess of 1,908 vrs. was found in their lines. This was left vacant between the Charco Redondo and the Jabali, and was located by virtue of railroad certificates.

The surveys of the Sacatosa, two leagues, and the Jabali, four leagues, are dated April 24, 1835, and the Grullo, four leagues, and the Pedernal, two leagues, are dated April 25, 1835.

None of the marks, natural or artificial, called for in the original surveys can be found and identified on the ground, except the line between the jurisdiction of Mier and of Guerrero. There is, however, no dispute between the parties hereto as to the location of the southwest lines of the surveys called for to bound the Pedernal on the northeast. The parties hereto are agreed that the east corner of the Pedernal is where the jurisdiction line intersects the southwest line of the Sacatosa, and that its northeast line extends thence N. W. with the southwest lines of the Sacatosa, the Jabali, the certificate survey, the Charco Redondo, and the Grullo; but they do not agree as to how far N. W. this line should extend. The appellees contend that the proper length of this line is 20,000 vrs. (400 cords), to a point 1,289.85 vrs. S. E. of the south corner of the Grullo. The appellants contend that the proper length of this line is 25,168 vrs., which would be to a point 941 vrs. southeast of the west corner of the Grullo, distance called for according to the field notes of the Grullo.

The respective theories of appellants and appellees are shown by the following sketch:

A, B, C, and D, indicate the corners of the Pedernal grant. as contended by appellee, and as found by the court. X, D, Y, Z, and the back lines of the porciones indicate the boundaries as claimed by appellants.

Appellee alleged that it was the owner of all of the land within certain described boundaries (the same as those claimed by appellants for the Pedernal grant), except two leagues belonging to appellants within said boundaries, which two leagues had never been surveyed, nor were the boundaries known; that appellants were claiming all of the land described in appellee's petition by virtue of said two-league grant; and

prayed judgment against defendants "to fix the boundaries and location of said grant, and for title and possession of all of the lands described in paintiff's petition ˎ in excess of said grant, with writ of possession."

The court rendered judgment fixing the boundaries of the Pedernal grant as follows: Beginning at where the extension of the Guerro and Mier jurisdiction line intersects the S. W. boundary of the Sacatosa grant; thence N. W. with the S. W. lines of the Sacatosa, Jabali, the certificate survey, Charco Redondo and Grullo, giving course and distances on each survey, in all 20,000ˎ vrs., to a point on the S. W. line of the Grullo 1,841.73 vrs. N. W. of its south corner; thence S. W. 550ˎ vrs.; thence S. E. 20,- 420 vrs., to intersection of the Guerro-Mier jurisdictional line; thence N. E. to the begining—containing 9,585.59 acres, which is 728.- 79 acres in excess of two leagues.

Judgment was rendered for the state and for parties who had purchased from the state for the remainder of the land described in plaintiff's petition.

Appellants are the heirs of the original grantee, Jesus Benavides.

### Opinion.

Appellants assign error upon the action of the court in overruling appellants' exception to appellees' petition. With the exception of the names of the parties and the land involved, the petition herein is a copy of the state's petition in Sullivan v. State, 41 Tex. Civ. App. 89, 95 S. W. 645; Id., 207 U. S. 416, 28 Sup. Ct. 215, 52 L. Ed. 274. On the authority of that case we overrule appellants' first assignment of error.

Appellants, under several assignments of error, complain of the action of the court in fixing the boundaries of the Pedernal grant as shown by our findings of fact herein, as not being supported by, but contrary to, the evidence.

This contention is based on the explanations attached to the plat: "a. [north corner] Lindo. de la Cabeca de la Canada del Defto. Mig."; "b. [west corner, evidently omitted by mistake] Yd del Matamos"; and the explanation of the survey; "the pasture land (the Pedernal grant) remained bounded on the southwest with lands of Rio Grande; * *ˑ * on the northwest with the Matamos."

"Lindo." is an abbreviation of "Lindero," a boundary or landmark; "Cabeca" should be "cabeza," head; "Canada" should be "cañada," which appellants insist means a drain; "Defto" should be "difto," a contraction of "difunto," dead; and "Mig." is doubtless a contraction of "Miguel," a proper name. The contention of appellants is that this should be translated, "Landmark at the head of the drain of Miguel, deceased."

The testimony shows that there is a drain known by that name, and that the north corner of the Pedernal, as claimed by appellants, is near the ˎhead of the same. Both the surveyor Monroe, witness for appellants, and the surveyor Blucher, witness for appellee, speak and read Spanish. They both testified that they did not know what "Matamos" means. It is the contention of appellants that "Matamos" was intended to be "matambo," which one of the Mexican witnesses testified meant a white horse with red ears. No other witness knew the meaning of "matambo."

[1] If it should be conceded that appellants are correct in their translation of these explanations attached to the original plat, it does not necessarily follow that the northeast line of the Pedernal should be extended 5,168 vrs. beyond its call for distance, to reach the point at or near the head of the Miguel drain. A call for a natural object will not control a call for course and distance, when it appears that the same was made by mistake or upon an erroneous conjecture. Boone v. Hunter, 62 Tex. 582; Sanborn v. Gunter, 84 Tex. 283, 17 S. W. 117, 20ˑ S. W. 72; State v. Sulflow, 60 Tex. Civ. App. 615, 128 S. W. 654; State v. Palacios, 150 S. W. 229; Hamilton v. State, 152 S. W. 1122; Crosby v. Stevenson, 156 S. W. 1114; Roberts v. Hart, 165 S. W. 476; Lafferty v. Stevenson, 135 S. W. 218; N. Y. & T. L. Co. v. Thomson, 83 Tex. 179, 17 S. W. 920; Jonesˎ v. Andrews, 62 Tex. 660.

[2] Was the call for the head of the drain of Miguel, deceased, if such is the call, inserted by mistake or upon conjecture? We think so. While some mistake in measurement is always liable to occur, it is inconceivable that the surveyor if he had actually run the northeast line of the Pedernal, would have made a mistake of 5,168 vrs., or 2.7 miles, in measuring the same.

If Canales platted this survey in his office, we think it should be inferred that he supposed the head of the Miguel drain was at or near the distance called for in his plat, rather than that he intended to extend the northeast line of the Pedernal to such place, regardless of the length of said line, and thus include in the survey nearly twice as much land as he certifies wasˎ embraced therein.

We think that Canales found the Mier-Guerro jurisdiction line, and ran northwest to the N. E. line of the old surveys, which he calls forˎ in the explanation of the Sacatosa, grant,ˑand ran thence S. E. for the S. W. line of the Sacatosa, and perhaps other surveys, and N. W. for the S. W. lines of the Jabali, Charco Redondo, and Grullo, from information thus gained. That he was confused in making his plats appears from the following facts: (1) An extension of the Mier jurisdiction line intersects the Sacatosa 735 vrs. S. E. of its west corner, but the explanation of the plat of the Pedernal does not show the Sacatosa. (2) His explanation attached to the plat of the Jabali shows it to be in the jurisdiction of Mier, whereas it was in the jurisdiction of Guerro. (3) He calls for the Jabali to be bounded on the S. W. with the lands of Garcia, Chapa, Martinez, and Izaguirre, whereas his plat of the Pedernal shows that the Jabali is bounded on the S. W. by that grant.

The west corner of the Grullo is called "Matambo." Appellants insist that this corner was so named for the reason it is in the vicinity of the Matambo hills; and, for a like reason, the west corner of the Pedernal was called "Matambo," which by error in transcribing appears as "Matamos" on the sketch. There appears toˎ be a range of hills running S. E. and N. W., across the N. W. line of the Pedernal, as claimed by appellants, known as the "Matambo" hills. Whether or not they were so known when Canales made these surveys does not appear from the record. Neither Matambo in the plat of the Grullo, nor Matamos in the plat of the Pedernal, calls for hills.

It was the custom of Mexican surveyors to name, not only the survey, but also the corners. These names were given sometimes from natural objects at or in the vicinity of the corner, and sometimes from something seen at the time ˑof making the survey, and, if for neither of these ˑ reasons, a ˑcorner would be named for one of the saints, as San Pedro (Saint Peter), or San Juan (Saint John). One of the surveys referredˑ to in the plat of the Pedernal (which means arrowhead) is called El Grullo, the crane; another, Charco Redondo, a round water hole; and another, Jabali, a wild boar. The surveyor may have seen a wild horse with red ears in the neighborhood of the west corner of El Grullo, and have named that corner Matambo. For the same reason he may have called the west corner of the Pedernal, Matambo. Wherever these corners are, they are not at the sameˑ place. The description of the Pedernal grant isˑ ˑ

that it is bounded "on the northwest with Matamos."

"Matamos" means, "we kill." Why such a name should have been given to a corner or a boundary we do not know, but we think this call is too uncertain to control the call for distance.

[3] Distance is often referred to as the most uncertain call in field notes. And so it often is, where it is apparent that there is a conflict between the call for distance and a call for an identified natural or artificial object. This for the reason that it is thus shown that either the call for the identified object, or the call for distance, was a mistake, and the mistake was more likely to have occurred in the measurement than in the call for the natural or artificial object. State v. Sulflow. 60 Tex. Cr. R. 615, 128 S. W. 654; State v. Palacios, 150 S. W. 236. There are however, no hard and fast rules as to whether the call for a natural or artificial object or a call for distance should control. State v. Sulflow and State v. Palacios, supra; Roberts v. Hart, 165 S. W. 476; Crosby v. Stevenson, 156 S. W. 1114. On the contrary, a call for distance is a definite and certain call, and, in the absence of evidence showing that it was inserted by mistake, will control the location of a survey. As shown by the authorities hereinbefore cited. a call for a natural or artificial object in conflict with the call for distance does not necessarily show that the call for distance is erroneous, and does not so show where it appears that such object was called for upon conjecture.

We reject the call for "Matamos," or "Matambo," if such it should be, as being too uncertain to control the call for distance. We reject the call for the "head of the drain of Miguel, deceased," if such be the call, as having been inserted upon an erroneous conjecture.

Thus far we have rested our decision upon the supposition that "Lindo. de la Cabeca, de la Canada del Defto. Mig." means, as asserted by appellants, "The head of the drain of Miguel, deceased." But it is not by any means certain that this is a correct translation. It will be seen, from an examination of the original plat, that no drain, creek, or stream is delineated thereon at or near the corner "a," though such appear on the southeast part of the plat. The word ordinarily used in Spanish for a small stream is "arroyo." "Cañada" means a glen or valley between mountains. "De la Cabeca, de la cañada del Defto. Mig." may well be translated, "At or toward the head of the valley of Miguel, deceased." Whether or not there is such a valley where the court placed the north corner of the Pedernal does not appear from the record.

Appellants insist that the statement attached to the plat that the Pedernal is "bounded on the southwest with the lands of the Rio Grande" requires that the south.vest lines of the Pedernal should coincide with the northeast or back lines of the porciones bordering on the Rio Grande.

The plat, as explained in the note attached thereto, shows the Pedernal to be bounded on the S. W. "con tierras de Rio Grande." "Tierras" means lands in the broad sense in which that word is used in English. If Canales meant by "the lands of the Rio Grande," the surveys fronting on the Rio Grande, this is a call by conjecture, for it is evident that he did not know where the back lines of these river surveys were. They were never surveyed on the ground, but were located in 1767 by marking the lower corner of No. 14, called "Bueno Noche," and calling for same to extend up the river 1,700 vrs., and back 20,000 vrs., and each additional porcion called to be of the same dimensions extending up the river, without giving the course of same and back the same as No. 14. each adjoining the one next below. Both Monroe and and Blucher ran out these porciones by meandering the river and located their back lines as indicated in the second plat in our findings of fact. Each of them was engaged about a month in making their surveys. It is evident that Canales did not even run the lower line of No. 14 from its lower corner. Had he done so, and intended that the east corner of that survey should be the south corner of the Pedernal, he would have ascertained the distance to the intersection of the jurisdiction line with the southwest line of the Sacatosa was 6,114 vrs., and would have made that the length of the southeast line of the Pedernal instead of 5,000 vrs.

Again, the Pedernal calls to be a trapezoid. From the lower river corner of No. 14 to the upper river corner of No. 27 is 12½ miles. Canales knew that, if the Pedernal was to be a trapezoid, its S. W. line could not follow the back lines of the porciones, unless the Rio Grande river was perfectly straight for a distance of 12½ miles—a supposition that no sensible man would indulge. Such a radical change in the configuration of a survey ought not to be made, without stronger evidence than the call for the unmarked, and, to the surveyor, unknown, line of the Rio Grande porciones, if that is what Canales meant by "the lands of the Rio Grande."

[4] The Pedernal, as claimed by the appellants, contains nearly double the quantity of land called for in that grant. It has frequently been said that quantity in a survey is immaterial. This is true when the lines and corners of the survey can be located with reasonable certainty, by reference to calls for natural or artificial objects, or for other surveys. But, when they cannot be thus located, quantity becomes a material circumstance in locating such lines and corners. There is no presumption of law that the surveyor made a mistake in his calls for quantity. Scott v. Pettigrew, 72 Tex. 328, 12 S. W. 161.

In addition to the heirs of Jesus Benavides, other parties who had purchased from the state were made defendants, in order that their title to the several surveys claimed by them might be adjudicated. One of these defendants was Jesus Ma. G. Martinez, who, by way of cross-action, pleaded the five-year statute of limitation, to section 434. situated outside of the limits of the Pedernal grant as found by the court, but on said grant as claimed by appellants. The evidence is sufficient to sustain such plea of limitation, for which reason we overrule appellants' eighth assignment of error.

We overrule appellants' plea of res adjudicata. The facts with reference to this matter are that in 1903 the state brought suit of trespass to try title against the heirs of Jesus Benavides for three sections of land located within the boundaries of that survey, as located by the judgment herein. The boundary of the Pedernal was not an issue in that suit, the only issue being the validity of that grant, which issue was decided in favor of defendants. Pena et al. v. State, 100 Tex. 433, 100 S. W. 915.

[5] A decision as to title not involving boundary is not res adjudicata in a suit to establish boundary not involving the title. 15 R. C. L. 1038; 23 Cyc. 1340; Moore v. Snowball, 98 Tex. 25, 81 S. W. 5, 66 L. R. A. 745, 107 Am. St. Rep. 586. This is true where, though an issue was raised by the pleadings and might have been adjudicated in the former suit, the judgment affirmatively shows that it was not. James v. James, 81 Tex. 380, 16 S. W. 1087; Whitman v. Aldrich, 157 S. W. 464.

This was not a suit to reform the boundaries of the Pedernal grant, but to ascertain and establish the same. for which reason it was not necessary to allege fraud, accident, or mistake in making the survey.

Finding no error of record, we affirm the judgment of the trial court herein.

Affirmed.

### On Motion for Rehearing.

The evidence in this case presents two theories: One is that the boundaries of the grant should be located by its call for a natural object at its northwest corner, and by the calls for the lands of the Rio Grande on the southwest. The other is that it should be located by its calls for course and distance from its undisputed corner at the intersection of the Mier jurisdiction line with the southwest line of the Sacatosa grant. The trial court decided in favor of the latter theory, and it is our duty to affirm the judgment of the court below, if it is sustained by reasonable and legal deductions from the evidence, even though, as an original proposition, we might have adopted the contrary theory.

However, for reasons set out in our original opinion herein, we think the trial court adopted the correct theory. We will briefly restate our reasons for such conclusion:

1. If the call "a Lindo. de la Cabeza de la Cañada del defto. Mig." means "the head of the drain of the deceased Miguel," such call was made upon an erroneous conjecture and should not control the call for course and distance.

2. "Cañada" means valley. Monroe, who made the survey for appellants, shows on his sketch that the Miguel drain begins just north of the northwest corner of the Pedernal, and crosses its northeast line about 3,000 vrs. to the southeast, and its southwest line on the northeast boundary of porcion No. 26. If by "cañada" Canales had meant drain, he probably would have shown same on his sketch, as he did other drains. If he made no actual survey, still he must have known that, if it was north of his line, it would run in a southerly direction toward the Rio Grande river, and thus cross both the northeast and southwest lines of his survey as sketched by him.

[6] There is nothing in the record outside of the word itself to indicate what "cañada" means. On the contrary, for the reasons above stated, we think it does not mean drain.

Appellants insist that we ought to accept the translation of witnesses who understand the Spanish language. In not doing so we do not assume to have any superior knowledge of the Spanish language. "Cañada" is not a technical word, and therefore not the subject·of expert testimony. Any one, though having no knowledge of the Spanish language, can ascertain its meaning by consulting a Spanish-English dictionary.

[7] 3. If the call for "the lands of the Rio Grande" means that the back lines of the porciones form the southwest boundary of the Pedernal, this call must be rejected, for the reason that to adopt it we would have to disregard the calls for course and distance, quantity, and the configuration of the survey. Canales said the survey was a trapezoid. He certainly knew that a trapezoid was bounded by straight lines, and likewise he must have known that the back lines of river surveys, fronting on the same for more than 12 miles, could not, in the nature of things, be a straight line, as indicated by his plat and his statement that the same was a trapezoid. Again, if the south corners of the Pedernal be placed at X and at Z (see sketch in opinion), as contended by appellants, a straight line from one to the other will conflict with a number of the porciones.

Believing that we have correctly decided this case, the motion for a rehearing is overruled.

Overruled.